**NAACP, WESTERN REGION, et al.,**
**Plaintiffs,**

**v.**

**Peter J. BRENNAN et al.,**
**Defendants.**

**Civ. A. No. 2010–72.**

United States District Court,
District of Columbia.

May 31, 1973.

---

Lawrence J. Sherman, Migrant Legal Action Program, Inc., Washington, D. C., Sarel M. Kandel, Washington, D. C., Robert Gnaizda, Albert Moreno, Public Advocates, Inc., San Francisco, Cal., Mario Obledo, Mexican-American Defense Fund, San Antonio, Tex., David Hall, United Farmworkers Organizing Committee, Tulsa, Okl., for plaintiffs.

Harlington Wood, Jr., Asst. Atty. Gen., Harold H. Titus, Jr., U. S. Atty., Harland F. Leathers, Atty., Dept. of Justice, Arnold T. Aikens, Asst. U. S. Atty., J. Michael Cogbill, Atty., Dept. of Justice, for defendants.

## MEMORANDUM OPINION

CHARLES R. RICHEY, District Judge.

This is a case of nationwide significance in that it bears directly on the wellbeing and social dignity of migrant and seasonal farmworkers throughout the United States and its territories. Plaintiffs are eighty-eight individuals and seventeen organizations who are either farmworkers or organizations whose members include farmworkers. They claim that Defendants, who are the Secretary of Labor and other officials within the Department of Labor, have violated Plaintiffs' rights and failed to fulfill their obligations to the Plaintiffs by participating in and perpetuating discriminatory and other unlawful practices being conducted by Federally-funded–State operated employment services, particularly those services dealing with farm labor. By approving the program operations of and providing financial support for state employment services which allegedly engage in racial and other types of discrimination, and which allegedly fail to insure that migrant and seasonal farmworkers receive such amenities as adequate food and housing from the employers to whom they are referred, Plaintiffs assert that Defendants have violated the Fifth Amendment to the Constitution, Title VI of the Civil Rights Act of 1964, and the Wagner-Peyser Act. In order to alleviate their plight, Plaintiffs have requested this Court to grant declaratory and injunctive relief directing Defendants to use their powers to require that these state employment agencies serve farmworkers according to law. Plaintiffs' claims have caused much concern to the Court, and after careful consideration of the facts and legal authorities presented by the parties, the Court has determined that Plaintiffs are entitled to a declaration that Defendants have violated Plaintiffs' rights in the past, and an injunction prohibiting Defendants from violating those rights in the future.

## I. BACKGROUND

Enacted in 1933, the Wagner-Peyser Act, (the Act), 29 U.S.C. §§ 49–49k, established the basis for a national system of public employment offices by creating the United States Employment Service (USES) within the Department of Labor. The purpose of the Act was to provide for a cooperative Federal-State system of public employment offices to be operated by the States under systems created by State law.[1] Today, the USES develops policies and methods for coordinating and guiding a nationwide network of more than 2,000 public employment offices in all 50 states, the District of Columbia, Puerto Rico, the Virgin Islands and Guam. While each local state office is State staffed and operated, the USES has the responsibility for insuring that State plans of operation conform with Federal laws; providing uni-

---

1. Affidavit of Charles E. Odell, Deputy Associate Manpower Administrator for the United States Employment Service, par. 2, Dec. 6, 1972.

form methods for operating employment service offices; maintaining a program for referring labor from one area to another; giving technical assistance to the State in legislation and administration; and assisting in the determination of funds necessary for the administration of the State Employment Service programs.[2]

The local state offices are 100% funded by Federal grants-in-aid pursuant to the provisions of Title III of the Social Security Act, the Wagner-Peyser Act and the Appropriation Act.[3]  In order for the State to obtain the financial assistance available under the Act, the State must accept the provisions of the Act and establish a State agency vested with the powers necessary to cooperate with the USES.[4]  In addition, the State must submit detailed plans for carrying out the provisions of the Act within the State.  If the plans conform to the provisions of the Act and are adequate to carry out its purposes, they are approved by the Secretary and notice given to the State.[5]  The Act further requires the State to submit reports to the Secretary; places a duty on the Secretary to ascertain whether the system of public employment offices maintained in each State is conducted in accordance with the Secretary's rules, regulations and standards of efficiency; and provides that the Secretary may revoke any existing certificate for funding or withhold any new certificate if he finds that the State has not properly expended the monies paid to it.[6]  In order to implement this funding system, and in accordance with his rule-making authority,[7] the Secretary has issued detailed regulations establishing the procedures for continuation and termination of funds, and the policies of the service under which the State offices are to be operated.[8]

The Wagner-Peyser Act provides for a Farm Labor Service (FLS) within the USES.[9]  Because it was established during the depression, when jobs were needed and severe agricultural labor shortages existed in particular areas, the FLS assumed a more active concern for the needs of farmer employers than for those of the farm workers.[10]  An extensive worker recruitment system was therefore established in order to allow the FLS to expeditiously provide manpower from other localities or other States when necessary to work in the fields.[11]  By 1969, this system and long years of high demand had created a large pool of labor, "many schooled only in farm field work, and many unaccustomed to any other life or work than the migratory farm labor stream." [12]  But through increased productivity occasioned by technological advances, the need for and shortage of agricultural workers "had completely reversed, leaving a serious condition of oversupply." [13]  At the same time, it was evident that the social and economic conditions of those workers who could still find farm employment were "less than desirable." [14]

As a result of the changed rural situation, the Department of Labor, in 1969, implemented an administrative reorganization which merged the Farm Labor Service into the Rural Manpower Service (RMS).  Farm labor placement was no longer the singular goal.  Instead, emphasis shifted to decreasing the supply of unskilled farm workers through

2.  *Id.*

3.  *Id.*

4.  29 U.S.C. § 49c.

5.  29 U.S.C. § 49g.

6.  29 U.S.C. § 49h.

7.  29 U.S.C. § 49k.

8.  20 C.F.R. 601.5, 601.6, 604, 605.

9.  29 U.S.C. § 49b(a).

10.  *Survey of the Rural Manpower Service* compiled by the Special Review Staff (SRS) of the Manpower Administration, released April, 1972 (hereinafter referred to as SRS Report) at 5–6.

11.  SRS Report at 6.

12.  SRS Report at 7.

13.  SRS Report at 7.

14.  SRS Report at 7.

the provision of full manpower services to rural residents—the same services which were provided in other areas by the Employment Service. The RMS, through a network of local state operated Employment Service offices, was thus to provide counseling, training and job development services.[15] In carrying out these services, policies and procedures were designed to insure that Federal statutory and regulatory requirements were met, and information on the states' adherence to Federal guidelines was to be regularly provided in the form of their reports to the Department of Labor.[16]

The instant litigation has its origins in an administrative complaint filed by the Plaintiffs and other petitioners with the Department of Labor on April 22, 1971. The complaint charged the RMS with violations of the petitioners' rights under the Constitution, the Wagner-Peyser Act, Title VI of the Civil Rights Act of 1964, the Immigration and Naturalization Act, the Occupational Safety and Health Act, and the Social Security Act, by allowing discrimination and violations of minimum wage, housing, sanitation, child labor, and foreign worker regulations to exist in the RMS system.

After extensive correspondence with Plaintiffs' counsel, and in response to expressions of interest shown by the Agricultural Labor Subcommittee of the House Education and Labor Committee, Defendants announced their decision to dispatch the Special Review Staff (SRS) of the Manpower Administration to conduct an intradepartmental investigation of Plaintiffs' charges and to report directly to the then Assistant Secretary for Manpower, Malcomb Lovell.[17] Ten months later, in April 1972, the SRS Report was released by Defendants, along with a separate document setting forth a Thirteen Point Plan aimed at correcting the problems the SRS found to exist at the time of its investigation.[18]

On April 24, 1972, then Assistant Secretary Lovell publicly explained the Department's action to the House Farm Labor Subcommittee. He minimized the seriousness of the civil rights and program violations contained in the SRS Report,[19] and this brought a vigorous challenge from the Plaintiffs. Then Secretary of Labor Hodgson subsequently invited the Migrant Legal Action Program, Inc., on behalf of the Plaintiffs, to meet with the Assistant Secretary for purposes of discussing the adequacy of his proposed reforms. The Migrant Legal Action Program, Inc., met with Defendants and informed them that the reforms were inadequate and that a meaningful plan of reform should be instituted on or before July 1, 1972, the beginning of the next fiscal year.[20] Over Plaintiffs' counsel's objections, Defendants, on July 1, 1972, refunded in place the entire network of state Rural Manpower Service and Employment Services serving farmworkers. This action, and the alleged failure of Defendants to take any visible action to correct the problems pointed out in the SRS Report, led to cessation of informal contacts between the parties and the filing of the present lawsuit.

## II. ISSUES

As Plaintiffs seek judicial relief as to allegedly substantial constitutional and statutory claims, they maintain that the Court has jurisdiction over the subject matter of this suit pursuant to 28 U.S.C. § 1343(3) and (4), 28 U.S.C. § 1331, and

---

15. SRS Report at 8.

16. Affidavit of Charles E. Odell, par. 2.

17. Affidavit of Lawrence J. Sherman, Attorney for the Plaintiffs, November 20, 1972.

18. The Thirteen Point Plan is set forth in Appendix A to this Opinion.

19. Hearings Before the Subcommittee on Agricultural Labor of the House Committee on Education and Labor, 92d Cong., 2d Sess., at 285 (1972).

20. Affidavit of Lawrence J. Sherman.

28 U.S.C. § 1337.[21] They further maintain that there is jurisdiction to review agency inaction, action contrary to law or action in excess of legal authority pursuant to 5 U.S.C. § 702 and 28 U.S.C. § 1361, because both substantive and procedural claims concerning the Department of Labor's handling of Plaintiffs' administrative complaint are also involved.[22] Defendants, on the other hand, argue that the Court lacks jurisdiction over the subject matter of this action where the Plaintiffs have failed to exhaust their administrative remedies under Title VI of the Civil Rights Act of 1964, and further that the Court is without jurisdiction to review the discretionary actions of the Defendants under Title VI and the Wagner-Peyser Act.

In the face of these contentions, there are four fundamental issues which require resolution by the Court. First, what are Plaintiffs' rights under the Fifth Amendment to the Constitution, Title VI of the Civil Rights Act of 1964 and the Wagner-Peyser Act? Second, have Defendants violated those rights? Third, if Plaintiffs' rights have been violated, does the Court have the authority to fashion relief or does the matter rest within the discretion of the Secretary of Labor? Finally, if the Court has the authority to fashion relief, what type of relief is most appropriate under the circumstances? These questions are not easily answered, and require separate and detailed consideration.

### III. DISCUSSION

A. *Defendants Have a Constitutional, Statutory and Regulatory Obliga-*

*tion to Require that the Federal and State Agencies Serving Minority Farmworkers Provide Those Farmworkers With the Full Level of Services, Benefits and Legal Protections as Guaranteed by the Fifth Amendment to the Constitution, Title VI of the Civil Rights Act of 1964, The Wagner-Peyser Act, and Defendants' Own Regulations.*

Plaintiffs have alleged that the Defendants have violated their Fifth Amendment rights through Defendants' active involvement with the State RMS and ES agencies, which are said to practice racial, national origin, sex and age discrimination against farmworkers both in the referral of jobs and the provision of employment office services.

While the Fourteenth Amendment's guarantee of equal protection of the laws, which applies only to the states, is a "more explicit safeguard of prohibited unfairness than 'due process of law'," as is required of the Federal Government by the Fifth Amendment, and although the due process and equal protection clauses are not "always interchangeable," it is nonetheless an established principle that discriminatory actions of Federal officials "may be so unjustifiable as to be violative of due process."[23] Moreover, such discrimination may arise when Federal officials provide financial assistance to, and exercise some degree of control over, State agencies that discriminate.[24] In accordance with these principles, it is evident that Plaintiff farmworkers have the right, under the Fifth Amendment, to

21. See, e. g., Gautreaux v. Romney, 448 F.2d 731, 733–735, 740 (C.A. 7 1971); Gomez v. Florida State Employment Service, 417 F.2d 569, 578–581 (C.A. 5, 1969); Hicks v. Weaver, 302 F.Supp. 619 (E.D.La., 1969).

22. See, e. g., Peoples v. United States Department of Agriculture, 138 U.S.App. D.C. 298, 427 F.2d 561, 563–566 (1970); DeVito v. Schultz, 300 F.Supp. 381, 381–383 (D.D.C., 1969); National Welfare Rights Organization v. Finch, 139 U.S.

App.D.C. 46, 429 F.2d 725, 727–728, 734, 739 (1970).

23. Bolling v. Sharpe, 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954).

24. See, e. g., Simkins v. Moses H. Cone Memorial Hospital, 323 F.2d 959, 963–970 (C.A. 4, 1963), cert. denied 376 U.S. 938, 84 S.Ct. 793, 11 L.Ed.2d 659; Gautreaux v. Romney, 448 F.2d 731, 740 (C.A. 7, 1971); Hicks v. Weaver, 302 F.Supp. 619, 622–623 (E.D.La., 1969).

receive the services, benefits and protections provided by the RMS and ES unencumbered by discriminatory practices.

■ Plaintiffs have the same right under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, which provides:

"No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

Title VI implements fundamental Fifth and Fourteenth Amendment prohibitions on government support to institutions which practice racial or national origin discrimination.[25]  It requires the issuance of implementing regulations and directives.  And recent cases indicate that both Title VI and the Fifth Amendment impose upon Federal officials not only the duty to refrain from participating in discriminatory practices, but the affirmative duty to police the operations of and prevent such discrimination by State or local agencies funded by them.[26]

Plaintiffs have further alleged that Defendants have not afforded them the full benefits and services required by the Wagner-Peyser Act.  The Wagner-Peyser Act mandates that Plaintiffs receive the full services and benefits offered by the "national system of employment offices" including "farm placement" services, the benefit of any system created "for clearing labor between the several states" and appropriate "information as to opportunities for employment." [27]  Under the Act, Defendants are required to set Federal standards for state agency performance, and to approve and fund only those state agency programs expressly found to be in compliance with agency regulations, standards, and approved work programs.[28]

In accordance with the requirements of setting standards of performance, Defendants have issued extensive implementing regulations.  Those regulations require that all applicants for employment services, including farmworkers, receive from each State agency access to all available job opportunities, employment counselling services, occupational analyses, and labor market information.[29]  Farmworkers, especially migrants, are entitled to special benefits and protections from State agencies.[30]

25. Griffin v. County School Board of Prince Edward County, 377 U.S. 218, 232, 84 S.Ct. 1226, 12 L.Ed.2d 496 (1964); Cooper v. Aaron, 358 U.S. 1, 19, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958); Commonwealth of Pennsylvania v. Board of Directors of City Trusts of the City of Philadelphia, 353 U.S. 230, 231, 77 S.Ct. 806, 1 L.Ed.2d 792 (1957).

26. Gautreaux v. Romney, *supra*, 448 F.2d at 739, Accord: Hicks v. Weaver, *supra*, 302 F.Supp. at 622–623.  See also United States v. Frazer, 297 F.Supp. 319, 323 (N.D. Alabama 1968).

27. 29 U.S.C. § 49b.

28. 29 U.S.C. §§ 49b, 49c, 49d.

29. 20 C.F.R. 602.2–6, 8.

30. 20 C.F.R. 602.9 provides that (a) recruitment must be "made in accordance with regulations, policies and procedures" of USES only after ascertaining that "domestic agricultural workers are not available locally or within the State"; (b) "the need and minimum number of workers required" was validated following operative USES procedures; (c) "the wages offered must not be less than the area's prevailing wage for similarly employed agricultural workers"; (d) housing and other facilities provided comply with specific regulations (20 C.F.R. 620 et seq.); (e) "the employer has offered to provide or pay for transportation for domestic agricultural workers" on terms "no less favorable" than specified prevailing practices; and (f) "other terms and conditions of employment offered" are not less favorable than those prevailing in the area of employment for domestic agricultural workers for similar work.  These housing, wages, living and transportation regulations were expressly adopted to "protect the interests of the workers. . . ."  Gomez v. Florida State Employment Service, 417 F.2d 569, 575 (C.A.5, 1969).

Defendant officials are required to provide all applicants, including farmworkers, the full benefits of the USES system.[31] There are a number of separate regulations designed to prevent and prohibit discrimination under the Wagner-Peyser Act and Title VI of the Civil Rights Act of 1964,[32] one of which is directed specifically to providing service to minority groups without discrimination or segregation based on race, creed, color or national origin.[33]

■ The above-mentioned regulations promulgated by the Defendants define State RMS and ES minimum program and civil rights performance for farmworkers. At the same time, however, they also impose a coordinate obligation on the Federal Government, through its officials, to enforce their own standards.[34] The power to issue and enforce the Department of Labor's rules, regulations, and standards of efficiency is "affirmatively placed upon the Secretary of Labor" and is of "substantive importance rather than merely procedural and administrative."[35]

The Secretary is not without ample authority and means to enforce the statutes and his own regulations. Title VI authorizes Defendants to effect compliance with its provisions by terminating assistance or refusing to grant or continue assistance to noncomplying recipients after they have been given notice and an opportunity for hearing, or by any other means authorized by law.[36] Defendants' authority under the Wagner–Peyser Act is backed by various program approval and modification powers culminating in fiscal and other program sanctions.[37] Defendants' own regulations, among other things, provide that State plans of operation must be approved by the Department of Labor officials and that funds will be appropriated only as necessary for the proper, efficient and lawful administration of the system; [38] that the Department of Labor must approve State laws and plans relating to the operation of public

31. Department of Labor policies, among other things, require USES to: (1) accept an application from any applicant without regard to his place of residence, current employment status, or occupational qualifications [29 C.F.R. 604.1 (a)]; (2) classify an applicant solely on the basis of all his occupational qualifications [20 C.F.R. 604.1(c)]; (3) provide nondiscriminatory treatment to and promote opportunities for older and women workers [20 C.F.R. 604.17, 604.19, 604.20]; (4) ensure that no preference is given any applicant or group of applicants except in accordance with legal requirements [20 C.F.R. 604.1(e)]; (5) ensure that workers are placed on jobs which utilize their highest skills [20 C. F.R. 604.1(f)]; (6) make no referral to a position where the service to be performed or the terms or conditions of employment are contrary to federal, state, or local law [20 C.F.R. 604.1(j)]; (7) recruit no workers for employment if wages, hours, or other conditions of work are substantially less favorable than those prevailing for similar work in the area [20 C.F.R. 604.1(k)]; and (8) process only those interstate clearances on which at least minimum compensation is specified [20 C.F.R. 604.2 (a), (c)]. USES policies also require that employment counseling services be provided to all applicants [20 C.F.R. 604.3].

32. 20 C.F.R. 604.8; 29 C.F.R. Part 31. 29 C.F.R. 31.3(b)(2), for example, provides that RMS and ES agencies, among others, may not "utilize criteria or methods of administration which have the effect of subjecting individuals to discrimination . . . or have the effect of defeating or substantially impairing accomplishment of the objectives of the program as respects individuals of a particular race, color, or national origin."

33. 20 C.F.R. 604.8.

34. Hicks v. Weaver, *supra*, 302 F.Supp. at 622–623; Gautreaux v. Romney, *supra*, 448 F.2d at 739.

35. 41 Op.A.G. 407, 412 (1959) (Opinion of then Attorney General William F. Rogers).

36. 42 U.S.C. § 2000d–1. Other means may include referral to the Department of Justice for initiation of civil prosecution.

37. 29 U.S.C. §§ 49c, 49g, 49h.

38. 20 C.F.R. 602.20 and 602.22.

employment offices; [39] that payment of funds may be withheld when a State's plan of operation no longer complies with the Wagner–Peyser Act or when money has not been expended in accordance with an approved plan; [40] and periodic reports for informational and policing purposes may be required.[41] Federal payments may be withheld after reasonable notice, some effort to resolve the matter informally, and a formal hearing.[42]

B. *Defendants Have Subjected Minority Farmworkers To Racial, National Origin, Sex and Age Discrimination, and Have Denied Minority Farmworkers the Employment Services to Which They Are Entitled.*

■ The report to the Assistant Secretary for Manpower submitted by the Special Review Staff of the Manpower Administration documented extensive problems and inequities which existed in the RMS and ES. The Report was publicly adopted as the Department's official findings and made public on April 21, 1972, by the Manpower Administration of the Department of Labor. While counsel for the Defendants have argued that the Report contains statements and conclusions of the investigators which are not sufficient in themselves to establish the facts that various statutory and regulatory violations had occurred, it is inconceivable to the Court that any other interpretation could be placed upon the detailed and specific findings contained therein. In accordance with the materials delineated in the SRS Report, the Court finds that Defendants approved the program operations of and provided financial support for State RMS and ES agencies which engaged in the following practices:

1. Denied Minority farmworkers the full range of employment services including testing, counseling, and job training and up-grading services.

2. Subjected minority farmworkers to racial, national origin, sex and age discrimination in recruiting and referring applicants for local, intra- and interstate employment.

3. Provided only substandard day-haul placement services and facilities to minority farmworkers.

4. Processed interstate clearance orders that discriminated by allowing employers to predesignate farmworkers by race, national origin, sex and age.

5. Processed misleading, inaccurate and incomplete job orders for agricultural labor.

6. Referred migrant farmworkers to employers who violated minimum wage and child labor laws.

7. Referred farmworkers to employers who failed to make social security payments to the workers' accounts.

8. Referred migratory and seasonal farmworkers to' jobs where the living and working conditions violated housing, health and sanitation laws.

9. Referred migratory farmworkers to segregated housing.

10. Referred farmworkers to unlicensed crewleaders or to crewleaders who operated illegally.

11. Failed to enforce the Federal Contractor Registration Act.

12. Failed to assist Federal officials charged with enforcing the Immigration and Naturalization Act and to follow their own regulations and directives that have been enacted to protect job opportunities, wages and working conditions of domestic farmworkers.

13. Been unresponsive to farmworkers' complaints.

39. 20 C.F.R. 601.1 and 601.3.

40. 20 C.F.R. 601.5(a)(7) and (8).

41. 20 C.F.R. 601.3 and 602.19.

42. 20 C.F.R. 601.5.

The Defendants approved, without modification based on the SRS Report, the State RMS and ES program operations for fiscal 1973 and refunded the State RMS and ES agencies in July of 1972, a time at which they had knowledge, through the SRS Report, of the findings cited above. The Thirteen Point Plan announced by then Assistant Secretary Lovell was not initially implemented until August of 1972.[43] Through these actions, Defendants knowingly acquiesced in and helped to perpetuate the discriminatory and otherwise improper practices of the State RMS and ES agencies. Because of those actions, Defendants failed to fulfill their obligations under the Fifth Amendment, Title VI of the Civil Rights Act of 1964, and the Wagner-Peyser Act, and are responsible for the violations of Plaintiffs' rights under those laws.

C. *Although the Defendants' Exercise of Administrative Discretion in the Issuance and Implementation of Their Thirteen Point Plan Is Not So Defective On Its Face As To Warrant Its Immediate and Total Abrogation by the Court, The Court Will Retain Jurisdiction Over This Action to Insure That Plaintiffs Receive the Benefits and Protections to Which They Are Entitled.*

Implementation of the Defendants' Thirteen Point Plan was initiated through the issuance of directives and Field Memoranda to the Regional Manpower Administrators in August, 1972. Also at that time, a Task Force was established by the Secretary to insure that the States complied with the directives. Other directives have been issued since August to provide additional guidelines for the implementation of the Thirteen Point Plan, and the Task Force has vis-

ited Regional, State and local offices to give technical assistance for the preparation of the State Plans of Service for fiscal 1974 and to assist in implementation of the plan at all levels. The Plans of Service from the states for fiscal 1974 are required to show the goals to be achieved during that fiscal year and the changes in organization, program and staff which will be made to obtain those goals. Other Administrations within the Department of Labor have taken and are taking steps to discharge their responsibilities to migrant workers in areas such as minimum wages, child labor and occupational health and safety.[44] Counsel for the Defendants have stated to the Court that any continuing violations of the statutes and regulations which have been found to exist have been dealt with and remedied informally as they have been discovered. They allege that the Regional offices have begun changes which either have or will correct the deficiencies that previously existed, and are monitoring the States and reporting their findings to the Department. They further allege that the "problems that existed a year ago when the investigation was in process have been greatly curtailed (sic) or eliminated, as the reports so indicate." [45]

On the basis of these activities, the Defendants argue that the Secretary has properly exercised his discretion and is entitled to judgment as a matter of law. *It is undisputed that Defendants have not made past or future funding of the State agencies contingent on compliance with the Thirteen Point Plan or other civil rights compliance or corrective measures, and that at no time have they commenced termination proceedings, instituted legal proceedings, or utilized any of their other fiscal or program powers against state agencies whose operating practices were found by the SRS*

---

43. See generally, Affidavit of Charles E. Odell, Deputy Associate Manpower Administrator for the United States Employment Service, December 6, 1972.

44. See generally, Affidavit of Robert S. Brown, Associate Manpower Admin-

istrator for the United States Employment Service, April 23, 1973.

45. Defendants' Memorandum in Support of their Motion to Dismiss, or, in the Alternative, for Summary Judgment, p. 29.

*Report to be in violation of Federal Law.*[46] Yet they contend that they are required by statute and their own regulations to attempt to secure voluntary compliance before such extreme measures are initiated,[47] and that until their voluntary program has had a chance to work, this Court, under the doctrine of exhaustion of administrative remedies and because discretion is vested in the Secretary, lacks jurisdiction over the subject matter of this suit.

In response to the arguments of Defendants, Plaintiffs assert that the violations of Federal law and regulations documented in the SRS Report are continuing despite the actions of the Defendants and their allegations to the contrary. In support of their claims, Plaintiffs have filed affidavits of migrant workers or persons representing the interests of migrant workers which are designed to demonstrate that these workers have been subjected to the same type of treatment by RMS and ES offices and the employers dealing with those offices as they were prior to the issuance and implementation of the Thirteen Point Plan. While these affidavits appear to be the results of a relatively limited survey of farmworker conditions conducted by the Plaintiffs themselves, they nonetheless indicate that there may be some basis in fact for Plaintiffs' claims.

Plaintiffs contend that the underlying cause of these continuing violations is the inadequacy of the Thirteen Point Plan and the failure of Defendants to take any more positive steps toward en-

forcing the statutory and regulatory requirements other than issuing directives and reviewing State reports. Plaintiffs complain that the strongest compliance measure used so far has been the initiation of negotiations with State officials, culminating in the obtaining of a voluntary agreement that the agency will cease those discriminatory practices documented in the compliance review. They contend that until this Court requires Defendants to adopt an entirely new plan with adequate enforcement and monitoring procedures, the problems documented in the SRS Report and their own affidavits will not be corrected. In the interim, they seek an injunction prohibiting the Defendants from granting any additional funds to State recipient agencies.

The Court finds itself faced with two fundamentally conflicting assertions. On the one hand, Defendants, as shown above, have argued that while there may have been past violations of the rights of Plaintiffs, the Secretary has exercised his discretion and formulated a plan which has been and will continue to be successful in its application to insure that Plaintiffs rights are respected. On the other hand, Plaintiffs argue that the steps thus taken by the Secretary have not been effective to remedy existing problems and are inherently inadequate to do so.

The Court does not find the Secretary's Thirteen Point Plan to be so defective on its face as to warrant the immediate total abrogation of that plan and the substitution of a new plan, more

---

46. Deposition of Charles E. Odell, p. 246.

47. Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d–1, requires that agency compliance may be effected by termination of assistance only after "an express finding on the record, after opportunity for hearing" and provided further that the agency "has determined that compliance cannot be secured by voluntary means." The Department of Labor's implementing regulations provide for the filing of an administrative complaint, 29 C.F.R. 31.8(b), investigation, 29 C.F.R. 31.8(c), attempt at voluntary compliance, 29 C.F. R. 31.8(d), and a hearing, 29 C.F.R. 31.9(b), before termination of federal assistance can take place.
The Wagner-Peyser Act, 29 U.S.C. § 49h provides: "The Secretary of Labor *may* revoke any existing certificates or withhold any further certificate provided for in section 49f of this title, whenever he *shall* determine, as to any State, that the cooperating State agency has not properly expended the moneys paid to it or the moneys herein required to be appropriated by such State. . . ." (emphasis added).

to the liking of the Plaintiffs, in its place. Under Title VI of the Civil Rights Act, the explicit limitations upon the power of the administrative officials to terminate Federal financial assistance and the requirement that the agency exhaust every effort at informal negotiations and correction of noncompliance dictate that a thorough exercise of administrative discretion be had prior to the Court's active interference.[48] This is especially true where, as here, an administrative correction of noncompliance through negotiations avoids harsh results attendant upon severance of all Federal financial assistance. The language of the Wagner-Peyser Act also indicates that the decision to effect compliance through the withholding of funds is committed to the discretion of the Secretary. 29 U.S.C. § 49h provides that "the Secretary *may* revoke any existing certificates or withhold any further certificate . . . whenever *he shall determine*" that the State agency has not properly utilized its Federal funds (emphasis added). In view of this discretionary authority and the emphasis on informal negotiations, the Secretary formulated his Thirteen Point Plan. It cannot be said *at this stage* of the litigation that the plan as adopted is so clearly defective as to constitute an abuse of administrative discretion.

Moreover, that plan should be given the opportunity to prove its worth. Some reasonable period of time must be allowed in order that its effectiveness or ineffectiveness may be determined. The doctrine of exhaustion of administrative remedies is firmly established in the jurisprudence of administrative law,[49] and the policies underlying the doctrine are applicable to a certain extent here. They are aimed at preventing "premature interruption of the administrative process" which would tend to drain the efficiency and purpose from the administrative process if parties were permitted to seek judicial relief at various intermediate stages; maintaining the balance of power between the executive and judicial branches; and preventing the inefficient use of judicial resources by requiring "finality" within the administrative system and thereby avoiding needless judicial review.[50]

While the Court thus recognizes that the policies underlying the doctrines of administrative discretion and exhaustion of administrative remedies are applicable to the instant proceeding, it must also recognize that these principles may not be invoked to excuse continuing violations of Plaintiffs' Constitutional and statutory rights. There are limits to the application of both principles, and once those limits have been exceeded, it is both the function and the duty of the Court to insure that Plaintiffs receive the relief to which they may be entitled.

The difficulty in the case before the Court is to determine where those limits lie. If, after an appropriate period of time has elapsed, it can be demonstrated to the Court's satisfaction that the Secretary's Thirteen Point Plan is in fact ineffective to remedy the violations of which Plaintiffs complain, should the Court be required to stand by while the Secretary issues a Fourteen Point or a Sixteen Point Plan, contending that he has finally resolved the problems and must be afforded a suitable period within which to implement his new scheme? The Court thinks not. In an analogous situation involving Title VI of the Civil Rights Act, Judge Pratt of this Court stated.[51]

---

48. See Powelton Civic Assn. v. HUD, 284 F.Supp. 809, 817–818 (E.D.Pa.1968); Taylor v. Cohen, 405 F.2d 277, 282 (C.A. 4 1969).

49. See, e. g., Myers v. Bethlehem Corp., 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638 (1938); McKart v. United States, 395 U.S. 185, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969); Aircraft & Diesel Equip. Corp. v. Hirsch, 331 U.S. 752, 67 S.Ct. 1493, 91 L.Ed. 1796 (1947).

50. McKart v. United States, *supra,* 395 U. S. at 193–195, 89 S.Ct. 1657.

51. Adams v. Richardson, 351 F.Supp. 636, 641 (D.D.C.1972).

"The underlying thrust of the statute requires that the agency involved . . . attempt at the outset to secure compliance by voluntary means, if such method is reasonably possible. This course involves negotiation, and negotiation takes time. To such extent, the defendants have discretion but such discretion is not unlimited.

"Where a substantial period of time has elapsed, during which period attempts toward voluntary compliance have been either not attempted or have been unsuccessful or have been rejected, defendants' limited discretion is ended and they have a duty to effectuate the provisions of § 2000d . . . . Under such circumstances, defendants cannot rely on their alleged complete discretion as justification for permitting the mandate of the statute to be unenforced."

Plaintiffs have asserted, and have produced a relatively limited quantum of evidence to show that their rights are still being violated despite the issuance and implementation of the Defendants' Thirteen Point Plan. The Court cannot ignore Plaintiffs' assertions, even though it does not believe that there is sufficient evidence presently before it is to justify all of the relief requested. More facts are required, and a reasonable opportunity provided for implementation of the Plan, before the Court would be willing to entertain a request for the full measure of relief which Plaintiffs seek. Nonetheless, the facts which Plaintiffs have already presented are sufficient, in the Court's opinion, to require that jurisdiction under the statutory provisions previously cited[52] be maintained, and limited injunctive relief granted, until it can be demonstrated that further relief is or is not necessary. At the same time, these circumstances compel a ruling that Defendants' Motion to Dismiss or for Summary Judgment be denied, for if, after the gathering of sufficient evidence upon which to base an informed judgment, it appears that Defendants have not alleviated the practices of which Plaintiffs complain, the Court will have the authority and the duty to insure that those practices are corrected.

D. *Pending the Submission of Additional Data From the Parties, the Court Will Limit Its Relief to Entry of an Injunction Requiring Defendants To Obey the Applicable Law.*

The Court has already indicated that Plaintiffs are entitled to a declaratory judgment as to Defendants' past violations of Plaintiffs' rights.[53] Entry of a declaratory judgment will have significant consequences in determining not only such injunctive relief as is presently deemed necessary, but also in determining the extent of any further relief deemed necessary in the event that Plaintiffs' rights are still being violated or should such violations resume in the future.[54] Detailed injunctive relief may well be appropriate at some future date. At present, however, the Court believes that an injunction which is general in nature and prohibits Defendants from participating in or perpetuating any discrimination or other unlawful practices against migratory and seasonal farmworkers is sufficient and appropriate. The injunction is necessary because "it cannot be said upon this record that full compliance with the law is assured without the issuance of an injunction."[55] The past practices of the State RMS and ES agencies documented in the SRS Report and the Affidavits submitted by the Plaintiffs indicate that this is true, and the matters so documented provide the basis for granting partial summary judgment for Plaintiffs and affording them some

---

52. Those provisions are: 28 U.S.C. § 1342 (3), (4); 28 U.S.C. §§ 1331, 1337 and 1361; and 5 U.S.C. § 702.

53. Subsection B, *supra.*

54. See Gautreaux v. Romney, supra, 448 F.2d at 736.

55. Cypress v. Newport News Hospital Assn., 375 F.2d 648, 658 (C.A.4 1967).

measure of injunctive relief. Even if Defendants can later demonstrate to the Court that their legal obligations have been discharged through the issuance and implementation of the Thirteen Point Plan, their present assertions of compliance have proven inconclusive, and the entry of an injunction, backed by the power of the Court to impose sanctions for any violations of its provisions, will help to insure compliance until such time as Plaintiffs may be able to provide sufficient evidence to bolster their claims.

The relief thus contemplated by the Court is not the full measure of relief requested by the Plaintiffs, who would have the Court enjoin Defendants from continuing to grant funds to the States until an entirely new plan has been formulated and its implementation initiated. This the Court is unwilling to do, particularly in view of the factors discussed in Subsection C of this Opinion. As Plaintiffs themselves have recognized, there are a number of ways in which Defendants may discharge their obligations to insure compliance by the State agencies. These methods include —in addition to termination of funding —conditional funding, referral to the Department of Justice for civil action, and attempting voluntary compliance through use of directives and field memoranda. Defendants have chosen the latter method of operation, and until it can be shown that (1) Defendants' attempts to secure voluntary compliance have been unsuccessful, and (2) Defendants have not taken any stronger steps, aside from those intended to secure voluntary compliance, to remedy the deficiencies, the relief requested by the Plaintiffs is too drastic to warrant serious and present consideration by the Court. Such "relief," coming at this time, could only hurt the very people Plaintiffs are trying to protect.

## IV. CONCLUSION

In conclusion, the Court notes that throughout their pleadings, Defendants have maintained that the States are indispensable parties to this litigation. No discussion has been devoted to this contention because the Court does not believe that it has merit. If, as the Court has already ruled, Defendants have an obligation to fulfill under the Fifth Amendment and other statutes and regulations cited herein, they should be held to that obligation. Holding Defendants to that obligation does not prejudice the States or require their presence before the Court in this litigation.

The Court will enter an Order denying Defendants' Motion to Dismiss, or, in the Alternative, for Summary Judgment, and will grant partial summary judgment for the Plaintiffs and enter a Declaratory Judgment and Injunction against Defendants to the extent indicated in the foregoing portions of this Opinion. The Court has indicated that it will retain jurisdiction over this matter in order to insure that any further relief which may prove necessary to protect the Plaintiffs is provided. It has also indicated that the factual record before it is so incomplete as to require additional input of data before any further decisions are made in this regard. Because the nature of that data is necessarily complex and will require extensive hearings and reports on the progress of the Thirteen Point Plan, the Court believes that some mechanism, operating as an arm of the Court, should be established for the purpose of gathering data on a continuing basis. What the Court envisions is the appointment of a special master and/or hearing examiner who would sit to gather information both as to any continuing violations of Plaintiffs' rights, and as to the steps being taken by the Defendants to remedy and correct such violations. In order to insure that the parties have ample opportunity to present their views concerning the appointment of a special master and/or hearing examiner, and to allow them to offer any suggestions they might have as to the function and role of such master, the Court will enter an Order to Show Cause why such special

master and/or hearing examiner should not be appointed, and why the Defendants should not bear the costs of such appointment.

## APPENDIX A

1. Steps are to be taken immediately in both the Rural Manpower Service and the Employment Service to begin a consolidation process which would result in integrated services at the local level. Such consolidation should be aimed at offering a broader spectrum of services to rural workers and employers and at providing sufficient resources to accomplish the objective. Surveys shall be conducted by the States to insure that as many resources as possible are directed to provide services in rural areas.

2. Immediate action shall be taken to correct any civil rights violation found during the review, whether it be with regard to race, color, sex, age, religion, or national origin. Procedures shall be implemented to insure that there is full and continuing compliance with civil rights laws.

3. Steps shall be taken to insure that all child labor laws are being followed. Job orders will not be accepted which provide incentives for youth to work in violation of Federal, State or local laws.

4. The Employment Standards Administration shall insure that sufficient resources are allocated to enforce effectively the agricultural minimum wage where complaints are made or violative conditions are suspected. Additionally, Governors should be encouraged to provide staffs outside the State ES agency to assist farm workers in handling their complaints and in improving their working and living conditions.

5. State ES agencies shall establish mechanisms to handle workers' complaints where job working conditions and wage specifications have not been delivered as promised.

6. The Occupational Safety and Health Administration will continue the implementation of its responsibility for the work-related problems of farm employees and will address particular attention to the areas of field sanitation and safety, pesticides, housing and transportation. OSHA will coordinate its efforts with other agencies which also have responsibility in these areas. Care should be taken to insure that present manpower compliance efforts are maintained while OSHA is developing its program to assure these responsibilities.

7. Responsibility for enforcement of the Farm Labor Contractor Registration Act will be transferred to the Employment Standards Administration.

8. A vigorous effort to have frequent payroll audits of foreign worker users will be instituted to insure that the adverse effect rate is being paid to foreign workers who have been certified under the Immigration and Nationality Act. Such payroll audits should convert piece rates into hourly earnings so that comparison may be made to the hourly adverse effect rate. The adverse effect rate should also be set high enough to insure that earnings of domestic workers are not depressed by the presence of foreign workers.

9. Regional office staffs will monitor the States' performance of prevailing wage surveys to insure that the piece rates are converted to hourly rates so that it may be determined that, where applicable, the established piece rates are in accordance with the Federal and State Minimum Wage Laws. Prior to referral, each worker shall be given a written statement, in the language in which he is most fluent, of all wage, payment schedules, field condition and other specifications which might influence his earnings.

10. The Interstate Clearance System shall be improved by requiring that a farm worker be given a copy of the job order and an explanation of the job specifications in his most fluent language, and by other means.

11. The Manpower Administration shall require the State employment service agencies to bring their rural day

haul operations into conformity with employment service policies and standards. Where such policies and standards are not being met, the MA shall consider alternative methods to provide service to workers and employers.

12. *Employment Service Manual* procedures will be published relating to such subjects as conflict of interest, taking applications on farm workers, methods of guaranteeing that no employer is served who is not in compliance with any relevant law, and insuring compliance with Social Security procedures. Once published, performance under these procedures is to be closely monitored. In addition, existing procedures contained in the Manual, such as those on services to workers, statistical reporting, discrimination, and child labor, performed by State Employment Service Agencies, shall be closely monitored.

13. The Manpower Administration will work to broaden State Civil Service requirements where necessary to allow individuals with general farm experience, nonagricultural experience and nonagricultural college degrees to become eligible for positions in the Employment Service serving rural and other clientele.