**RHODE ISLAND CHAPTER, ASSOCIATED GENERAL CONTRACTORS OF AMERICA, INC., Plaintiff,**

**v.**

**Juanita KREPS, in her capacity as Secretary of Commerce of the United States, the City of Pawtucket, the City of Warwick, the City of Newport, the City of East Providence, the City of Cranston, the City of Woonsocket, the Town of North Kingstown, the Town of Coventry, the Town of Johnston, the Town of North Providence, and the Pawtucket Redevelopment Agency, Defendants.**

**Civ. A. No. 77–0676.**

United States District Court,
D. Rhode Island.

Feb. 6, 1978.

Peter Lawson Kennedy, Providence, R. I., for plaintiff.

Everett C. Sammartino, Asst. U. S. Atty., Providence, R. I., for Juanita Kreps.

Moses Kando, City Sol., Pawtucket, R. I., for City of Pawtucket.

William J. Toohey, City Sol., Warwick, R. I., for City of Warwick.

James S. O'Brien, Frederick W. Faerber, Jr., Newport, R. I., for City of Newport.

Orlando A. Andreoni, Providence, R. I., Nathaniel J. Rendine, East Providence, R. I., for City of East Providence.

John F. Sherlock, Jr., Maryfrances McGinn, Providence, R. I., for Pawtucket Redevelopment Agency.

Girard Visconti, Providence, R. I., for R. I. Subcontractors.

Jeremiah S. Jeremiah, Jr., City Sol., Cranston, R. I., for City of Cranston.

Gerald M. Brenner, Asst. City Sol., Woonsocket, R. I., for City of Woonsocket.

Bernard F. McSally, Providence, R. I., for Town of North Kingstown.

Frank J. Williams, Providence, R. I., for Town of Coventry.

William H. Corrente, Asst. Town Sol., Johnston, R. I., for Town of Johnston.

Robert D. Ciresi, Town Sol., North Providence, R. I., for Town of North Providence.

## OPINION

PETTINE, Chief Judge.

Plaintiff, the Rhode Island Chapter, Associated General Contractors of America, Inc., challenges whether Congress can, consistent with the Fifth Amendment, pinpoint a percentage of government public works contracts for minority businesses, upon a finding that such businesses do not successfully compete because of past and present discrimination.

Congress authorized the Secretary of Commerce to make grants to state and local governmental entities for use in public works projects in the Local Public Works Capital Development and Investment Act

of 1976, 42 U.S.C. §§ 6701–10 (1976) which is Title I of the Public Works Employment Act of 1976, Pub.L. 94–369, 90 Stat. 999 (July 22, 1976). Congress required the Secretary, in allocating grants, to take into consideration the duration and severity of unemployment and underemployment in the localities to be funded, particularly the degree of unemployment in the construction and construction-related industries, and the extent to which proposed public works projects would reduce that unemployment, 42 U.S.C. §§ 6706, 6707.

Congress so acted to "alleviate the problem of national unemployment and . . . to stimulate the national economy," H.R. Rep. 94–1077, 94th Cong., 2d Sess. *reprinted in* (1976) U.S.Code Cong. & Admin.News 1746, 1747, after finding that

> For the past two-and-a-half years, the United States has experienced its most severe recession since the Great Depression of the 1930's. . . . (T)he 1974–1975 recession has left an aftermath of high unemployment which will remain high throughout the remainder of this decade. . . .
>
> The construction industry has been a major victim of the current recession. *Id.* at 1746.

In 1977, Congress increased the original appropriation of two billion dollars for this Act to six billion through December, 1978. Act of May 13, 1977, Pub.L. 95–29, Title I, Ch. III, 91 Stat. 122.

Congress also imposed new conditions upon the making of these grants in the Public Works Employment Act of 1977, Pub.L. 95–28, Title I, 91 Stat. 116 (May 13, 1977), which amended the earlier Act. Congress required that state and local governments award construction contracts to private businesses

> . . . by competitive bidding, unless the Secretary shall affirmatively find that, under the circumstances relating to such project, some other method is in the public interest. Contracts for the con-

struction of each project shall be awarded only on the basis of the lowest responsive bid submitted by a bidder meeting established criteria of responsibility. . . . 42 U.S.C. § 6705(e)(1) (1977).

Congress further provided, and this is the nub of the present controversy, that ten percent of the amount of each grant must go to minority businesses:

> Except to the extent that the Secretary determines otherwise, no grant shall be made under this chapter for any local public works project unless the applicant gives satisfactory assurance to the Secretary that at least 10 per centum of the amount of each grant shall be expended for minority business enterprises. For purposes of this paragraph, the term "minority business enterprise" means a business at least 50 per centum of which is owned by minority group members or, in case of a publicly owned business, at least 51 per centum of the stock of which is owned by minority group members. For the purposes of the preceding sentence, minority group members are citizens of the United States who are Negroes, Spanish-speaking, Orientals, Indians, Eskimos, and Aleuts. 42 U.S.C. § 6705(f)(2) (1977).

This minority business enterprise (MBE) provision, introduced by Representative Mitchell of Maryland and amended by Representative Roe, was added to the legislation during the floor debate in the House of Representatives (123 Cong.Rec. H1441, daily ed. Feb. 24, 1977). Brief House and Senate debates [1] furnish the only legislative history. The sponsor, Representative Mitchell, explained the provision in debate, as follows:

> . . . All this amendment attempts to do is to provide that those who are in minority businesses get a fair share of the action from this public works legislation.
>
> . . . . .

---

1. The minority business enterprise provision was set forth in the Senate on March 10, 1977, (123 Cong.Rec. S3910, daily ed.).

Let me tell the Members how ridiculous it is not to target for minority enterprises. We spend a great deal of Federal money under the SBA program creating, strengthening and supporting minority businesses and yet when it comes down to giving those minority businesses a piece of the action, the Federal Government is absolutely remiss. . . . The average percentage of minority contracts, of all Government contracts, in any given fiscal year, is 1 percent. . . .

In the present legislation before us it seems to me that we have an excellent opportunity to begin to remedy this situation. . . .

. . . . . .

. . . Many States and many local subdivisions have moved into the process of setting aside contracts for minorities. That is because that is the only way we are going to get the minority enterprises into our system.

. . . We cannot continue to hand out survival support programs for the poor in this country. We cannot continue that forever. The only way we can put an end to that kind of a program is through building a viable minority business system. So I am deadly serious about it.

The other objection that will be raised is the objection that everybody else is going to go on a competitive bid basis; why should not the minority enterprise people go on a competitive bid basis? The answer is very simple: we cannot. We are so new on the scene, we are so relatively small that every time we go out for a competitive bid, the larger, older, more established companies are always going to be successful in underbidding us.

*Id.* at 1436–37.

Pursuant to her authority under the Act, the Secretary of Commerce promulgated regulations on May 27, 1977 which provide:

(b) . . . (1) No grant shall be made under this part for any project unless at least ten percent of the amount of such grant will be expended for contracts with and/or supplies from minority business enterprises. (2) The restriction contained in paragraph 1 of this subsection will not apply to any grant for which the Assistant Secretary makes a determination that the ten percent set-aside cannot be filled by minority businesses located within a reasonable trade area determined in relation to the nature of the services or supplies intended to be procured.

13 C.F.R. 317.19(b) (1977).

According to interpretive guidelines issued by the Department of Commerce, an applicant/grantee, for example a municipality, must assure that the 10 percent requirement for minority businesses will be met. In the alternative, the grantee can apply for a partial or total waiver either before or after initial bidding or subsequent to project approval. Among the factors considered for a waiver are the size of the minority population in the project area, the availability of minority enterprises and the efforts made to enlist minority firms. Guidelines For Round II of the Local Public Works Program, Sec. VIII B.1, at 30–31 (June 6, 1977). Various government agencies will assist grantees and prime contractors to locate qualified minority businesses in the area. Guidelines for 10% Minority Business Participation in LPW Grants, at 4–6, 16 (August, 1977). If noncompliance occurs following project approval, termination of the project may be effected unless both the grantee and the prime contractor are blameless. *Id.* at 6–7.

*The Facts of the Case*

Pursuant to this Act and regulations, various Rhode Island Island municipalities applied for and received grants, totalling $17,876,000.00 for twenty public works projects. The City of Pawtucket invited bids and indicated that a responsive bid must agree to commit at least 10 percent of the contract sum to minority businesses, in compliance with the statute. In response, several of plaintiff Association's contractor members submitted bids. One member was awarded the contract as the lowest responsive bidder. However, two other members

submitted bids of a lower dollar amount but failed to comply with the 10 percent requirement; their bids were therefore deemed unresponsive.

Claiming on behalf of itself and its members, the Rhode Island Chapter alleges economic injury and violation of the right not to be discriminated against on the basis of race. Plaintiff asserts that the use of the 10 percent quota is a racial classification that is inherently suspect and requires the most rigid scrutiny from this Court. *Loving v. Virginia,* 388 U.S. 1, 11, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); *McLaughlin v. Florida,* 379 U.S. 184, 191–92, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964); *Bolling v. Sharpe,* 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954); *Korematsu v. U. S.,* 323 U.S. 214, 216, 65 S.Ct. 193, 89 L.Ed. 194 (1944); *Hirabayashi v. U. S.,* 320 U.S. 81, 100, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943). Plaintiff claims that as a consequence of this classification, the minority business enterprise provision violates the equal protection guarantee of the Fifth Amendment, *Bolling v. Sharpe,* 347 U.S. at 499, 74 S.Ct. 693; *Washington v. Davis,* 426 U.S. 229, 239, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *U. S. Dept. of Agriculture v. Moreno,* 413 U.S. 528, 538, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973); *Schneider v. Rusk,* 377 U.S. 163, 168, 84 S.Ct. 1187, 12 L.Ed.2d 218 (1964). Plaintiff seeks permanent injunctive and declaratory relief against the Secretary of Commerce and the municipal grantees from enforcement of the minority business enterprise requirements.

The Rhode Island Subcontractors Association has intervened as a plaintiff and the City of Providence Human Relations Commission has submitted a brief in support of the statute's constitutionality, as amicus curiae. This Court held a hearing on November 18, 1977. No temporary restraining order or preliminary injunction has issued. By agreement of the parties, this matter is presently before the Court for final injunctive relief on the merits.

To date, a number of federal district courts have considered preliminary injunctive relief in similar suits. Only two have granted contractor associations relief. One court has reached the merits and upheld the constitutionality of the statute.[2]

## Conclusions of Law

This Court has given the closest consideration to this most serious problem which implicates the rights and the hopes of minority persons of reaching the same economic opportunity and self-sufficiency as others. It implicates the interests of white persons who wish to enjoy the opportunities which they have struggled to achieve. Further, it implicates the interest we all have in the preservation of those values at the core of the guarantee of equal protection of the laws.

This Court concludes[3] that Congress has three independent sources of con-

---

**2.** Challenges to this statute have been brought in the following cases: *Wright Farms Construction, Inc. v. Kreps,* 444 F.Supp. 1023 (D.Vt.1977); *Fullilove et al. v. Kreps et al.,* 443 F.Supp. 253 (S.D.N.Y.1977); *Associated General Contractors of Kansas, Inc. v. Secretary of Commerce, et al.,* No. 77–4218 (Dec. 17, 1977); *Ohio Contractors Association v. Economic Development Administration,* No. 77–619 (S.D. Ohio Nov. 22, 1977); *Montana Contractors Association v. Higgins,* 439 F.Supp. 1331 (D.Mont. 1977); *Associated General Contractors of Wyoming, Inc. v. Secretary of Commerce,* No. 77–222 (D.Wyo. Nov. 4, 1977); *Florida East Coast Chapter of the Associated General Contractors of America v. Secretary of Commerce,* No. 77–8351 (S.D.Fla. Nov. 3, 1977); *Associated General Contractors of California v. Secretary of Commerce,* 441 F.Supp. 955, No. 77–3738 (C.D. Calif.1977); *Constructors Association of West-*

ern *Pennsylvania v. Kreps,* 441 F.Supp. 936, No. 77–1035 (W.D.Pa.1977). Of these, only two courts, Vermont and California, have enjoined administration of the statute. The New York, Ohio and Pennsylvania courts applied a strict scrutiny test and refused to issue a preliminary injunction against the statute. New York has upheld the constitutionality in a final judgment.

**3.** Government defendants assert two preliminary grounds for dismissal: that plaintiff association lacks standing and has failed to exhaust administrative remedies before bringing suit. These challenges are rejected by this Court for essentially the same reasons articulated by the other courts who have reviewed attacks on the statute by contractor associations around the country. *Associated General Contractors of*

stitutional authority which permit the use of a non-stigmatizing, benign racial classification for the distribution of monies in aid of those who are subject to racial and economic discrimination. These sources are:

1) The spending power, Art. I, § 8, cl. 1 which permits the spending of federal funds for the common benefit.

2) Power under the Fourteenth Amendment § 5 to prevent the implication of federal, state and local governments in the discriminatory practices of private persons as these practices affect the workings of the market-place.

3) Power under the Thirteenth Amendment § 2 to eliminate the badges and incidents of slavery.

■ After reviewing the source and scope of authority under the spending clause and the Fourteenth Amendment § 5, this Court will subject the means adopted by Congress—a racial quota—to the close scrutiny required by the Fifth Amendment equal protection guarantee. However, we

*Calif.*, at 961–63; *Constructors Association of Western Pa.*, at 943–46.

An association has standing to bring suit on behalf of its members when:

> (a) its members would otherwise have standing to sue in their own rights; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted, nor the relief requested, requires the participation of individual members in the lawsuit.

*Hunt v. Washington Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977). Suit by both plaintiff Contractors Association and plaintiff-intervenor Subcontractors Association satisfies these criteria. One, already some contractor members have suffered economic injury in lost bids because of the minority business enterprise requirement. Plaintiff alleges that even the successful bidder reduces his profit by having to subcontract work he could have performed himself. Nonminority members of the Subcontractor Association lose opportunities to compete for work and suffer the cognizable noneconomic injury of discrimination based on race. Two, both organizations are committed to assuring fair, non-discriminatory bidding. Three, plaintiff seeks only declaratory and injunctive relief, not damages, on the grounds that the statute is unconstitutional on its face. No individualized determinations with regard to operative facts or relief are necessary. Although one contractor member was awarded a contract upon satisfaction of the 10 percent requirement, the possible absence of economic injury to him with regard to this one project, out of a possible twenty, does not destroy the Contractor Association's standing to seek generalized relief. In *Warth v. Seldin*, 422 U.S. 490, 515, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), the discrepancy in injury to different members of a builders' association made their individual participation necessary to the damage claim only. It was the lack of any present injury suffered by even one member, rather than the discrepancy in injury, which destroyed the association's standing to seek declaratory and injunctive relief.

Any conflict among competing Contractor Association members over the Pawtucket project does not affect the standing of the Association to assert the rights of injured members. The Association does not function like a class representative, Fed.R.Civ.P. 23(a)(4),. as defendants suggest. It need not adequately represent the interest of the member who won the Pawtucket contract. That member can intervene to represent his own interests pursuant to Fed.R. Civ.P. 24 without the showing of inadequate representation required under Rule 23(d). The suit by the Association has the same effect on this member's rights as would any facial attack brought by a single contractor on his own behalf.

Defendants' claim that plaintiffs' suit must be dismissed for failing to seek a waiver of the 10 percent requirement is also without merit. In fact, two Rhode Island grantees did seek waivers and were denied. Moreover, the language of the Guidelines (June, 1977), *supra*, suggests that this remedy is available only to grantees and not to individual contractors. But even assuming a contractor could request a waiver, that effort is not necessary. The basis for plaintiffs' challenge is that imposition of the 10 percent requirement is unconstitutional on its face. Part and parcel of the alleged unconstitutional burden is the directive to make all feasible efforts to satisfy the requirement before administratively seeking a waiver. Thus, the claim comes within the exemption from the requirement of exhaustion recognized by the Supreme Court in *Public Utilities Comm'n of California v. United States*, 355 U.S. 534, 78 S.Ct. 446, 2 L.Ed.2d 470 (1958). The Court provided:

> [W]here the only question is whether it is constitutional to fasten the administrative procedure onto the litigant, the administrative agency may be defied and judicial relief sought as the only effective way of protecting the asserted constitutional right.

*Id.* at 539–40, 78 S.Ct. at 450. No factual or legal determination in a waiver proceeding is likely to obviate the necessity for judicial decision of the facial, constitutional challenge to the statute.

subject the exercise of Thirteenth Amendment power to a scrutiny which takes into account the unique historical relationship of that Amendment to race.[4]

### The Spending Power

■ Congress drew power to enact the Public Works Employment Act of 1976 and 1977 from its spending power, Art. I, § 8, cl. 1. That power is "limited only by the requirement that it shall be exercised for the common benefit," *U. S. v. Gerlach Live Stock Co.*, 339 U.S. 725, 738, 70 S.Ct. 955, 962, 94 L.Ed. 1231 (1950).

The basic principle that must govern an assessment of any constitutional challenge to a law providing for governmental payments of monetary benefits is well established. Governmental decisions to spend money to improve the general public welfare in one way and not another are "not confided to the courts. The discretion belongs to Congress, unless the choice is clearly wrong, a display of arbitrary power, not an exercise of judgment." *Helvering v. Davis*, 301 U.S. 619, 640, 57 S.Ct. 904, 81 L.Ed. 1307. *Mathews v. deCastro*, 429 U.S. 181, 185, 97 S.Ct. 431, 434, 50 L.Ed.2d 389 (1976). *See Buckley v. Valeo*, 424 U.S. 1, 90–91, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); *Richardson v. Belcher*, 404 U.S. 78, 84, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971); *Flemming v. Nestor*, 363 U.S. 603, 611, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960). Further, the power of the United States to establish the conditions in contracts, such as those implicated in this case, is plenary and generally unrestricted. *See Perkins v. Lukens Steel Co.*, 310 U.S. 113, 127, 60 S.Ct. 869, 84 L.Ed. 1108 (1940);

---

4. Plaintiff also claims that the minority business enterprise requirement, 42 U.S.C. § 6705(f)(2), requires contractors to act in a way inconsistent with 42 U.S.C. § 6727 which both prohibits discrimination on account of race and national origin, among others, by those receiving money under Subtitle II of the Public Works Employment Act, 42 U.S.C. §§ 6721–6735, and authorizes the Secretary of Commerce to enforce Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq., which forbids discrimination in government contracts. Plaintiff also claims that contractors will be subject to liability in private suits under 42 U.S.C. §§ 1981, 1982 by non-minority subcontractors and suppliers if they comply with the statutory requirement to take race into consideration. The plaintiff claims that such inconsistent requirements that compel the contractor to violate federal law and to subject himself to liability constitute a violation of his due process rights under the Fifth Amendment. The plaintiff urges this Court to find that Title VI takes precedence over and negates the minority business requirement. In effect, the Court is urged to conclude that the legislative process followed in enacting the minority business requirement, admittedly summary and without detailed factual findings, was just not as "potent" as that followed in enacting Title VI. Courts just cannot reach such a conclusion. To the contrary, the lack of detailed debate may reflect a sufficient consensus to pass the minority business requirement without major legislative battle. More specifically, Congress has sufficiently familiarized itself over the past decade with the nature of discrimination that it need not repeat lengthy legislative findings of fact.

As the last passed act of Congress, *Araya v. McLelland*, 525 F.2d 1194, 1196 (5th Cir. 1976); *International Union of Electrical, Radio and Machine Workers v. N.L.R.B.*, 110 U.S.App. D.C. 91, 95, 289 F.2d 757, 761 (1960), and as the most specific of the various relevant statutes, *Morton v. Mancari*, 417 U.S. 535, 550–51, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974); *Bulova Watch Co. v. U. S.*, 365 U.S. 753, 758, 81 S.Ct. 864, 6 L.Ed.2d 72 (1961); *Rodgers v. U. S.*, 185 U.S. 83, 87–88, 22 S.Ct. 582, 46 L.Ed. 816 (1902), the minority business requirement constitutes a defined exception to whatever liabilities the other statutes might create. *Cf. United Jewish Organization v. Carey*, 430 U.S. 144, 164–65, 97 S.Ct. 996, 51 L.Ed.2d 229. It is for a court to reconcile legislation passed by Congress where possible, not to choose among them. *Morton v. Mancari*, 417 U.S. at 551, 94 S.Ct. at 2483 ("The Courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of coexistence, it is the duty of the courts, absent a clearly expressed Congressional intention to the contrary, to regard each as effective."). It is worth noting that the various laws cited consistently strive for the same objective, and that race-sensitive remedies are necessary to enforcing antidiscrimination statutes. In regard to any apparent inconsistency with Title VI, it is also worth noting that regulations implementing Title VI permit affirmative action to correct prior discrimination or limited participation. 15 C.F.R. 8.4(b)(6) (1977); *cf. Lau v. Nichols*, 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974).
Thus, the plaintiff is not subjected to inconsistent liabilities.

*U. S. v. New Orleans Public Services*, 553 F.2d 459, 469 (5th Cir. 1977), U.S.App.Pending.

 It, of course, needs no repetition that the relief of unemployment redounds to the common benefit, *Chas. C. Steward Mach. Co. v. Davis*, 301 U.S. 548, 586–87, 57 S.Ct. 883, 81 L.Ed. 1279 (1937); *Helvering v. Davis*, 301 U.S. 619, 641, 57 S.Ct. 904, 81 L.Ed. 1307 (1937). Nor is there any doubt that Congress may pin-point spending in various localities of intense unemployment and underemployment or that it may choose to concentrate on urban poverty or rural poverty or that it may attack certain sources of poverty without challenging others. Nor is there any doubt that Congress may, for the common benefit, remedy economic disparity which has resulted from discrimination, *see Califano v. Webster*, 430 U.S. 313, 317, 97 S.Ct. 1192, 51 L.Ed.2d 360 (1977) (per curiam). Congress also may pass protectionist legislation which reasonably aids some types of businesses but not others. *See Williamson v. Lee Optical Co.*, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955).

There would be no doubt as to Congress's power to enact this legislation were it not that Congress has employed a racial classification to pin-point funds for those in our country who are especially discriminated against, especially subject to unemployment and especially in need of aid in their efforts to become economically competitive.

 We find that this classification survives constitutional challenge based on the equal protection guarantee because it is benign in fact, justified by the compelling interest of remedying inequality pursuant to a congressional finding of past discriminations and closely tailored to achieve its purpose. For an extended analysis, see "Scrutiny of the Racial Classification," *infra.*

### Section Five of the Fourteenth Amendment

 A second locus of power for this congressional action is the enforcement provision, section five,[5] of the Fourteenth Amendment. In enacting the minority business enterprise requirement, Congress has sought to end past, present and future government involvement in the racial discrimination practiced by the private construction industry. Congress could rationally conclude that, given the widespread discrimination in the construction industry, discussed *infra,* and the low percentage (1 percent) of federal contract dollars that go to minority businesses, there is a substantial possibility that state and local governments have awarded or will award contracts involving federal monies to firms which discriminate against minorities. Although there is no indication that state and local governments have purposefully and willfully discriminated in the award of contracts, the fact of pervasive private discrimination supports a finding that frequently the state and local governments have made or will make such awards with notice, actual or constructive, of discriminatory practices by private firms. *See Gilmore v. City of Montgomery*, 417 U.S. 556, 582, 94 S.Ct. 2416, 41 L.Ed.2d 304 (1974) (White, J., concurring). Moreover, the award of government contracts based solely on neutral, competitive bidding inevitably locks in and even exacerbates the effects of past discrimination, namely the present dearth of minority business enterprises and the inability of those small minority operations that do exist to offer competitive bids. *See discussion infra.* Pursuant to its section five powers, Congress can adopt appropriate remedial and prophylactic measures that address this government involvement. *See generally Oregon v. Mitchell*, 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970); *Katzenbach v. Morgan*, 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966); Cox, The Role of Congress in Constitutional Determinations, 40 U.Cinn.L.Rev. 199 (1971).

**5.** Section five states: "The Congress shall have power to enforce, by appropriate legislation, the provisions of this article."

■ Government participation in the discrimination practiced by private contractors is clearly within the reach of Congress' enforcement powers under section five. When a state or local government awards a public works contract to a discriminatory construction firm with notice of the firm's discriminatory practice, the government agency has established a relationship with the contractor that makes the agency a "joint participant" in the private discrimination. *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 725, 81 S.Ct. 856, 6 L.Ed. 45 (1961); *see Wright v. City of Brighton, Alabama*, 441 F.2d 447 (5th Cir. 1971) *cert. denied* 404 U.S. 915, 92 S.Ct. 228, 30 L.Ed.2d 190 (sale of city property to segregated private school). Such government involvement has been condemned as state action in violation of section one of the Fourteenth Amendment. In *Burton v. Wilmington Parking Authority, supra*, for example, a municipal parking authority leased premises in the municipal garage to a restaurant that refused to serve blacks. Based on the leasing relationship and the mutual benefits conferred, the parking authority had become a "joint participant" in the discrimination. By its inaction, the government had "elected to place its power, prestige and property" behind the discrimination. *Id.* 365 U.S. at 725, 81 S.Ct. 856.[6]

No less government involvement exists when a government agency awards an emergency public works contract to a firm that does not deal with minority subcontractors or employees. For the duration of the contract, the firm accomplishes the specific government objective of building needed public facilities. At the same time, the federal government pours billions of dollars in aid into the construction industry with the specific purpose of rescuing the construction industry from its depressed economic condition and resuscitating it. Such a "symbiotic relationship," to use a phrase of *Burton*,—with the federal government providing the resources—implicates the government in the industry's discrimination. *See, e. g., Ginn v. Matthews*, 533 F.2d 477 (9th Cir. 1976) (privately operated Headstart Program involves state action); *McQueen v. Druker*, 438 F.2d 781, 784 (1st Cir. 1971) (private developer of low-income housing under federal incentive program involves state action); *see*, State Action: Theories for Applying Constitutional Restrictions to Private Activity, 74 Colum.L. Rev. 656, 685 (1974).

---

**6.** Since the *Burton* decision, the Supreme Court in *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974) has required, for a finding of state action, a "close nexus" between the government action and the violation of the Fourteenth Amendment. However, the *Jackson* test is only applicable in the absence of a *Burton* type relationship between the government and the discriminatory party. *Braden v. University of Pittsburgh*, 552 F.2d 948, 956–58 (3d Cir. 1977); *cf. Jackson, supra*, 419 U.S. at 357, 95 S.Ct. 449; *Marlboro Corp. v. Association of Independent Colleges*, 556 F.2d 78, 79–80 (1st Cir. 1977) (both the Supreme Court and the First Circuit Court still cite *Burton* as authority). Since a *Burton* relationship between government agencies and their discriminatory contractors is posited here, we need not inquire into whether there is also a "close nexus." Moreover, a number of courts have suggested that less active government involvement is necessary to constitute state action when the Fourteenth Amendment violation involves racial discrimination. *See, e. g., Granfield v. Catholic University of America*, 174 U.S.App.D.C. 183, 194, 530 F.2d 1035, 1046 n.29, *cert. denied*, 429 U.S. 821, 97 S.Ct. 68, 50 L.Ed.2d 81 (1976); *Greco v. Orange Memorial Hospital Corp.*, 513 F.2d 873, 879 (5th Cir. 1975); *Turner v. Impala Motors*, 503 F.2d 607, 611 (6th Cir. 1974); *Jackson v. Statler Foundation*, 496 F.2d 623, 628–29 (2d Cir. 1974); *Fletcher v. Rhode Island Hospital Trust National Bank*, 496 F.2d 927, 931 (1st Cir.), *cert. denied*, 419 U.S. 1001, 95 S.Ct. 320, 42 L.Ed.2d 277 (1974); *Adams v. Southern California First National Bank*, 492 F.2d 324, 334–35 (9th Cir. 1973), *cert. denied*, 419 U.S. 1006, 95 S.Ct. 325, 42 L.Ed.2d 282 (1974); *cf. Lucas v. Wisconsin Electric Power Co.*, 466 F.2d 638, 656 (7th Cir. 1972), *cert. denied*, 409 U.S. 1114, 93 S.Ct. 928, 34 L.Ed.2d 696 (1973). Thus, the "close nexus" test applied to the due process claim in *Jackson* is inapplicable to government involvement in racial discrimination practiced by private parties. The rationale for the double standard derives from the historic relationship of the equal protection clause and race and from the fact that where racial discrimination is concerned, even governmental inaction takes on the appearance of affirmative approval and support. *Lefcourt v. Legal Aid Society*, 445 F.2d 1150, 1155 n.6 (2d Cir. 1971).

Moreover, any discrimination in subcontracting or hiring by a government contractor engaged in a public works project will have high visibility in the surrounding community, *see Associated General Contractors of Mass., Inc. v. Altshuler*, 490 F.2d 9, 18 (1st Cir. 1973) *cert. denied* 416 U.S. 957, 94 S.Ct. 1971, 40 L.Ed.2d 307. The visibility is increased and the nexus greater because the construction occurs on government property, *Gilmore v. City of Montgomery*, 417 U.S. at 573, 94 S.Ct. 2416. For example, the Town of Coventry, Rhode Island is contracting for a town hall and public library to be built. The selection of a discriminatory contractor in preference over a non-discriminatory bidder will doubtless encourage the continuation of the discriminatory practices of the former and lock-in the effects of prior discrimination. Even if purely financial advantage motivates the government agency's choice, the total effect of its action is to place the government's imprimatur on the discriminatory practice in the minds of the community. *See Gilmore v. City of Montgomery*, 417 U.S. at 582, 94 S.Ct. 2416 (White, J., concurring); *Burton v. Wilmington Parking Authority*, supra.

■ Beyond even the government's imprimatur, an award provides direct, federal financial aid to the discriminatory construction firm. *See Norwood v. Harrison*, 413 U.S. 455, 467, 93 S.Ct. 2804, 37 L.Ed.2d 723 (1973). A government contract is a particularly valuable asset when the industry as a whole is depressed and the federal funding limited. *See Gilmore v. City of Montgomery*, 417 U.S. at 574, 94 S.Ct. 2416 (decisions about "rationed" state resources more likely to involve state action problems). Not only can Congress act pursuant to section five to assure that no federal monies reach firms that discriminate, Congress and government agencies may even have affirmative duties to take reasonable steps to assure the non-discriminatory use of federal funds under the Fifth and Fourteenth Amendments. *See United States v. City of Chicago*, 395 F.Supp. 329, 342–43 (N.D.Ill.1975), *aff'd* 525 F.2d 695 (7th Cir. 1975); *N.A.A.C.P. Western Region v. Brennan*, 360 F.Supp. 1006,

1012 (D.D.C.1973) (federal "affirmative duty to police the operations of and prevent such discrimination by State or local agencies funded by them."); *Gautreaux v. Romney*, 448 F.2d 731, 739–40 (7th Cir. 1971); *cf. Green v. Kennedy*, 309 F.Supp. 1127, 1136–37 (D.D.C.1970), *app. dis'd* 398 U.S. 956, 90 S.Ct. 2169, 26 L.Ed.2d 539 and 330 F.Supp. 1150, 1164–65 (D.D.C.1971), *aff'd sub nom. Coit v. Green*, 404 U.S. 997, 92 S.Ct. 564, 30 L.Ed.2d 550 (1971). These duties may include investigation of the successful competitive bidder when past history places the government on notice of potential discriminatory practices. *McNeal v. Tate County School Dist.*, 460 F.2d 568 (5th Cir. 1972), *cert. denied* 413 U.S. 922, 93 S.Ct. 3049, 37 L.Ed.2d 1044 (1972); *United States v. Mississippi*, 499 F.2d 425 (5th Cir. 1974).

■ It cannot be overemphasized that Congress has addressed in the statute at bar only government involvement in private discrimination, not the private discrimination itself. Today's conclusion that the government involvement may be sufficient to permit Congress to exercise its section five powers is not intended to suggest that the discriminatory practices of the government contractor constitute state action in violation of section one of the Fourteenth Amendment. *See Gilmore v. City of Montgomery*, 417 U.S. at 573, 94 S.Ct. 2416; *Wright v. City of Brighton, Alabama*, 441 F.2d at 450. In addition, this Court need not and does not decide whether Congress can, under its section five powers, reach and limit state discriminatory involvement which does not rise to a violation of section one. *Cf. United States v. Guest*, 383 U.S. 745, 775–84, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966) (Brennan, J., joined by Warren, C. J. and Douglas, J., concurring). Without doubt, however, Congress has the power to enact broad prophylactic remedies to prevent state and local involvement in discrimination. This power is even more firmly established when the remedy affects only the manner of spending federal funds and does not regulate typical state and local governmental activities nor private activities traditionally within those governments' control.

### Scrutiny of the Racial Quota

██ Congress has the power under both the spending clause and section five of the Fourteenth Amendment to enact the challenged legislation. It remains to be decided whether such legislation, because it employs a racial quota, passes constitutional muster under the Fifth Amendment guarantee of equal protection. Because Congress has employed a racial quota [7] to remedy racial imbalance presently existing in the award of government contracts, this Court will give careful scrutiny to: one, whether the purpose and effect of the racial classification is truly benign; two, whether a compelling need to remedy past discrimination exists; and, three, whether the means adopted were carefully tailored to accomplish the remedial goal.

 1) Preliminarily, the Court concludes that the minority business enterprise requirement was enacted solely with the intent to remedy racial discrimination and not to malign either minorities or non-minorities. *See Brest,* Foreword: In Defense of the Antidiscrimination Principle, 90 Harv.L.Rev. 1, 15–22 (1976). Obviously, if Congress intended to discriminate against either group, the statute would be invalid. *United Jewish Organizations v. Carey,* 430 U.S. 144, at 165, 97 S.Ct. 996, 51 L.Ed.2d 229 (White, J.), at 179, 97 S.Ct. 996 (Stewart, J., concurring) (1977). All remarks on the floor of the House and Senate are directed solely to the plight of the minority business. "No racial slur or stigma," *id.* at 165, 97 S.Ct. 996, is cast upon either non-minority or minority contractors by the legislators [8] or by the legislation itself.[9] The failure of minority businesses to obtain more federal contracts was attributed solely to past discrimination and not to any racial stereotype of incompetence. In fact, the guidelines promulgated pursuant to the statute make clear that only *qualified* minority contractors must be employed. Only inexperience, generally due to past discrimination, is to be excused. Guidelines (Aug. 1977) *supra,* at 3. Thus, the statute's legitimate purpose is not overshadowed by a stigmatizing effect or purpose, or an outmoded stereotype, *cf. Califano v. Webster,* 430 U.S. at 317, 97 S.Ct. 1192, nor is an invidious purpose or

7. A word must be said about "quotas." Some have taken great semantic strides to avoid the word "quota." This Court is not so wary despite the fact that in the past quotas have been used by those on the "in" to keep out the "outs." So long as they are benign, quotas may be used to remedy past discrimination. The real current problem with a quota, when applied to some institution like a university or corporation, is not that it names a racial group but that it undermines normal admission, hiring and advancement practices and it threatens the system of expectations about entrance and advancement held by those in and about the institution. *See Weber v. Kaiser Aluminum & Chem. Corp.,* 563 F.2d 216, 229–234 (Wisdom, dissenting); *Flanagan v. President and Directors of Georgetown College,* 417 F.Supp. 377 (D.D.C.1976). Quotas are much more disruptive than goals because they seem to require the substitution of whatever notions of merit prevail at a particular institution with a non-meritorious, indeed suspect, criterion. We need not address that issue here for this case does not involve the disruption of an institution. Nor does it involve divesting those with reasonable expectations for the benefit of others. In the market-place, no such expectations become firm and there is no accrued right to a government contract, especially to funds only recently made available on an emergency basis.

No on-going private institutional arrangements are being disrupted by the use of this quota. The market, not a private institution, is the locus of this remedy.

8. For example, Representative Mitchell who proposed the minority business enterprise requirement, explained the need for preferential treatment thus:

The other objection that will be raised is the objection that everybody else is going to go on a competitive bid basis; why should not the minority enterprise people go on a competitive bid basis? The answer is very simple: we cannot. We are so new on the scene, we are so relatively small that every time we go out for a competitive bid, the larger, older, more established companies are always going to be successful in underbidding us. That is an absolute truism.

123 Cong.Rec. H. 1437 (daily ed. Feb. 24, 1977).

9. The California court suggests that a stigmatizing label of "discriminatory" is cast upon the white construction industry. *Associated General Contractors of California v. Secretary of Commerce,* 441 F.Supp. at 966, No. 77–3738 (C.D.Cal.1977). Surely, this is not the kind of label of inferiority the Fourteenth Amendment is intended to protect against.

effect merely "cloaked in preferential garb." *United Jewish Organizations v. Carey,* 430 U.S. at 173, 97 S.Ct. 996 (Brennan, J., concurring).

■ 2) The second question is whether an interest sufficiently compelling to justify use of a racial quota exists. Plaintiff concedes, as indeed it must in light of the First Circuit's decision in *Associated General Contractors of Mass., Inc. v. Altshuler,* 490 F.2d 9 (1973), *cert. denied* 416 U.S. 957, 94 S.Ct. 1971, 40 L.Ed.2d 307 (1974), that remedying past discrimination constitutes a compelling interest. *Cf. Califano v. Webster,* 430 U.S. at 317, 97 S.Ct. 1192.[10] In *Altshuler,* a "compelling need" to remedy the present under-utilization of minorities in the construction industry caused by past discrimination in the building trade unions justified the state's insistence on 20 percent minority employment in the performance of state contracts.[11] *Id.* at 18.

Plaintiff nevertheless disputes whether Congress has made adequate findings of past or present discrimination to establish a need sufficiently compelling to justify the use of a racial quota. Plaintiff contends that, absent judicial-like findings of specific discrimination by the construction industry in the United States, no "compelling need" is established. Plaintiff goes further and suggests that the statute loses its remedial character without such findings and that a racial quota can only be used as a specific remedy for past discrimination. In effect,

plaintiff's argument makes Congress' powers under section five co-extensive with the court's power to employ racial quotas, as for example, to remedy violations of Title VII or the equal protection clause. This Court disagrees, *see United Jewish Organizations v. Carey,* 430 U.S. at 161, 97 S.Ct. 996 (White, J.); *cf. Katzenbach v. Morgan,* 384 U.S. 641 at 648, 86 S.Ct. 1717, 16 L.Ed.2d 828.

■ Notably, for many years, courts have fashioned broad-based, race-conscious remedies to undo the effects of specific past acts of discrimination. *See, e. g., Franks v. Bowman Transportation Co., Inc.,* 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976) (retroactive seniority); *Swann v. Charlotte-Mecklenburg,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971) (school assignment); *Boston Chapter NAACP, Inc. v. Beecher,* 504 F.2d 1017 (1st Cir. 1974) *cert. denied* 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775; *Castro v. Beecher,* 459 F.2d 725 (1st Cir. 1972) (preferential hiring).[12] Court-ordered remedial racial preferences are constitutionally permissible even though they necessarily burden non-minorities who may not have been guilty of discrimination. *Franks v. Bowman Transportation Co., Inc.,* 424 U.S. at 773–79, 96 S.Ct. 1251. The scope of Congress' power to enact race-conscious remedies that burden innocent members of non-minorities is not only equal to the judicial branch's but extends significantly be-

---

**10.** In *Califano,* the Supreme Court reached a similar conclusion with regard to a gender-based preference in the Social Security Act. Applying the appropriate standard of review for gender classifications, the Court said:. "Reduction of the disparity in economic condition between men and women caused by a long history of discrimination against women has been recognized as such an important governmental objective." 430 U.S. at 317, 97 S.Ct. at 1194.

**11.** Judge Coffin's eloquent statement of the present necessity for race-conscious remedies bears repetition:

The first Justice Harlan's much quoted observation that "the Constitution [is colorblind] . . . [and] does not . . . permit any public authority to know the race of those entitled to be protected in the enjoyment of such rights", *Plessy v. Ferguson,* 163

U.S. 537, 554, 16 S.Ct. 1138, 1145, 41 L.Ed. 256 (1896) (dissenting opinion) has come to represent a long-term goal. It is by now well understood, however, that our society cannot be completely colorblind in the short term if we are to have a colorblind society in the long term. After centuries of viewing through colored lenses, eyes do not quickly adjust when the lenses are removed. Discrimination has a way of perpetuating itself, albeit unintentionally, because the resulting inequalities make new opportunities less accessible. Preferential treatment is one partial prescription to remedy our society's most intransigent and deeply rooted inequalities. *Altshuler,* 490 F.2d at 16.

**12.** For an extensive list, *see Altshuler,* 490 F.2d at 16–17.

yond. See *Swann v. Charlotte-Mecklenburg,* 402 U.S. at 16, 91 S.Ct. 1267, *cited in Altshuler,* 490 F.2d at 17. In the past, Congress has enacted broad remedial measures that purposely skirt the case-by-case approach characteristic of adjudication. *South Carolina v. Katzenbach,* 383 U.S. 301, 328, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966).[13] *See Brest, supra,* at 30, 32. Congress can enact remedies without first making judicial-like findings of past discrimination and the remedies can be designed to ameliorate lingering effects of past discrimination or prevent remote future discrimination. *E. g., Oregon v. Mitchell,* discussed in note 11 *supra; Brest, supra,* at 32, 47; *see Germann v. Kipp,* 429 F.Supp. 1323 (W.D.Mo.1977); *cf. Frontiero v. Richardson,* 411 U.S. 677, 689 n.22, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1972).

This power derives from the essential difference between the judicial and the legislative forum. Congress necessarily acts on a level of generality, both in its fact-finding and the scope of its remedies, far beyond that appropriate to a court limited to the case or controversy at bar. Thus, it would be inappropriate, in fact impossible, to require Congress to make judicial-like findings of discrimination before it could enact remedies that employ racial quotas. *Ohio Contractors Assoc. v. Economic Development Administration,* No. 77–619, Slip op. at 18 (S.D.Ohio 1977); *United Jewish Organizations v. Carey,* 430 U.S. at 161, 97 S.Ct. 996; The Supreme Court, 1976 Term, 91 Harv.L.Rev. 284, 290–91.[14]

■ Consequently, Congress need not make a finding of discrimination in each trade in each state before it may take action. Based on evidence of racial imbalance and a long catalogue of judicial findings of discrimination in the building trades, Congress could reasonably infer that the effects of past discrimination persistently continue. The inference of discrimination can ration-

13. The pattern of the voting rights legislation is an important example. Initially, Congress banned literacy tests in states with only 50 percent of its eligible voters registered or actually voting. This fixed numerical trigger was based on a general observation of the discriminatory effect of literacy tests instead of actual findings in each state. *South Carolina v. Katzenbach,* 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966). This legislative generalization was subsequently extended to ban all literacy tests, despite the fact that, in many states, the test was not used to discriminate and despite the Supreme Court's refusal to find that literacy tests constitute a per se constitutional violation. *Oregon v. Mitchell,* 400 U.S. 112, 132–34, 146–47, 216–17, 232–36, 282–84, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970) (all Justices concurring). Similarly, the Court has recently upheld Congress' use of broad classifications in place of individualized determinations in a spending program when administrative ease and prophylactic effect are promoted. *Weinberger v. Salfi,* 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975). Justice Rehnquist wrote:

> Under those [equal protection] standards, the question raised is not whether a statutory provision precisely filters out those, and only those, who are in the factual position which generated the congressional concern reflected in the statute. Such a rule would ban all prophylactic provisions . . . . Nor is the question whether the provision filters out a substantial part of the class which caused congressional concern, or whether it filters out more members of the class than non-members. The question is whether Congress, its concern having been reasonably aroused by the possibility of an abuse which it legitimately desired to avoid, could rationally have concluded both that a particular limitation or qualification would protect against its occurrence, and that the expense and other difficulties of individual determinations justified the inherent imprecision of a prophylactic rule.

> *Id.* at 777, 95 S.Ct. at 2472.

*See Brest, supra,* at 32–33. *Cf. Califano v. Jobst,* 434 U.S. 47, 98 S.Ct. 95, 54 L.Ed.2d 228 (1977).

14. Whatever ultimate conclusion the Supreme Court reaches about the capacity of state executive agencies, *Bakke v. Regents of University of California,* 18 Cal.3d 34, 132 Cal.Rptr. 680, 553 P.2d 1152 (1976), *cert. granted,* 434 U.S. 963, 98 S.Ct. 500, 54 L.Ed.2d 448 (1977) or state legislatures or private parties, *Weber v. Kraiser Aluminim & Chemical Corp.,* 563 F.2d 216 (5th Cir. 1977), to make findings of discrimination or to implement affirmative action remedies without specific findings of discrimination, it is beyond doubt that Congress has that power. Both *Bakke* and *Weber* involve voluntary programs adopted without congressional mandate. Indeed, *Weber* holds that Congress mandated in Title VII against the affirmative action program undertaken by a private firm. *See also Flanagan v. President and Directors of Georgetown College,* 417 F.Supp. 377 (D.D.C.1976) (affirmative action plan violates Title VI).

ally be drawn from the evidence of racial imbalance, since Congress could not possibly engage in an examination of discriminatory intent nor, indeed, need Congress condition remedial action upon such a finding.[15] Similar inferences, based solely on statistical evidence and affidavits respecting the underrepresentation of minorities in construction employment, satisfied the test of a "compelling need" in *Altshuler,* 361 F.Supp. at 1298, *aff'd,* 490 F.2d at 18 n.15.

 Our survey of the factual support for Congress' conclusion that the effects of past discrimination persist is not limited to the record before Congress. *But see Associated General Contractors of California v. Secretary of Commerce,* 441 F.Supp. at 964–965, No. 77–3738 (C.D.Cal. 1977). Judicial review takes into account any facts, not necessarily those actually considered by Congress, that underlie and support the congressional assumption that the effects of past discrimination continue, particularly when those facts are so well known and have been exhaustively documented in congressional reports, presidential commissions and countless other proceedings over the past two decades. *See Weber v. Kaiser Aluminum & Chemical Corp.,* 563 F.2d 216, 235 n.18 (Wisdom, dissenting). *Ohio Contractors Assoc. v. E. D. A., supra,* at 18–19; *see also Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. 61, 78–9, 31 S.Ct. 337, 55 L.Ed. 369 (1911). Moreover, the traditional judicial deference to congressional fact-finding is properly exercised with respect to findings of racial imbalance and past discrimination. *Oregon v. Mitchell,* 400 U.S. at 247–49, 91 S.Ct. 260 (Brennan, J.); *Katzenbach v. Morgan,* 384 U.S. at 668, 86 S.Ct. 1717 (Harlan, J., dissenting); *see Cox, supra.*

Although minorities comprise 17 percent of the population, they control only about 4 percent of the businesses. Minority business enterprises account for less than one percent of the national gross business receipts. U. S. Dept. of Commerce, Office of Minority Business Enterprise, Minority Business Opportunity Committee Handbook, at I-1 (August, 1976) ("Handbook"); Office of Management and Budget, Interagency Report on the Federal Minority Business Development Programs, at 24 (March, 1976) ("Interagency Report"). Despite voluntary programs to encourage award of government contracts to minority businesses, these businesses still receive less than 1 percent of federal, state and local government contracts. U. S. Commission on Civil Rights, Minorities and Women as Government Contractors, at 2, 86 (May, 1975) ("Report").

This imbalance can be traced to past discrimination by construction firms, *see* Note, Minority Construction Contractors, 12 Harv.Civ.Rt.Civ.Lib.L.Rev., 692, 692 n.3 (1977), by building trade unions, and by financial institutions. Cases of discrimination in the skilled unions, particularly in the building trades, are legion. *See, e. g., Rios v. Enterprise Ass'n Steamfitters Local 638 of U. A.,* 501 F.2d 622 (2d Cir. 1974); *United States v. Wood, Wire and Metal Lathers International Union, Local 46,* 471 F.2d 408 (2d Cir.), *cert. denied,* 412 U.S. 939, 93 S.Ct. 2773, 37 L.Ed.2d 398 (1973); *Associated Gen. Contractors of Mass., Inc. v. Altshuler,* 361 F.Supp. 1293 (D.Mass.), *aff'd,* 490 F.2d 9 (1st Cir. 1973), *cert. denied,* 416 U.S. 957, 94 S.Ct. 1971, 49 L.Ed.2d 307 (1974); *Contractors Ass'n of Eastern Pa. v. Secretary of Labor,* 442 F.2d 159 (3d Cir.), *cert. denied,* 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971); *Local 53 Asbestos Workers v. Vogler,* 407 F.2d 1047 (5th Cir. 1969); *United States v. Local 212, IBEW,* 472 F.2d 634 (6th Cir. 1973); *United States v. IBEW Local 38,* 428 F.2d 144 (6th Cir.), *cert. de-*

---

**15.** *Compare Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) (upholds statutory doctrine of racially discriminatory proportional impact with *Washington v. Davis,* 426 U.S. 229, 238–40, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) (disapproves constitutional doctrine of racially discriminatory impact, and requires judicial finding of intent to discrimi-

nate); *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 270–71, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *see Boston Chapter NAACP, Inc. v. Beecher,* 504 F.2d at 1027 (approves use of race-conscious remedies for unintentional discrimination pursuant to Title VII); *Brest, supra,* at 32–33.

*nied,* 400 U.S. 943, 91 S.Ct. 245, 27 L.Ed.2d 248; *United States v. Carpenters Local 169,* 457 F.2d 210 (7th Cir.), *cert. denied,* 409 U.S. 851, 93 S.Ct. 63, 34 L.Ed.2d 94 (1972); *United States v. Sheet Metal Workers International Ass'n, Local No. 36,* 416 F.2d 123 (8th Cir. 1969); *United States v. Ironworkers Local 86,* 443 F.2d 544 (9th Cir.), *cert. denied,* 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971).

That racial imbalance in employment on construction projects is a national phenomenon is evidenced by the large number of affirmative action plans, both voluntary and mandatory, adopted on the state and local level pursuant to Executive Order 11246 to combat local underutilization of minorities in construction work. *See, e. g., Rossetti Contracting Co., Inc. v. Brennan,* 508 F.2d 1039 (7th Cir. 1975) (Chicago); *Rios v. Enterprise Ass'n Steamfitters Local 638 of U. A.,* 501 F.2d at 625 (New York); *Altshuler, supra* (Boston); *Northeast Construction Co. v. Romney,* 157 U.S.App.D.C. 381, 485 F.2d 752 (1973) (Washington, D. C.); *Contractors Assoc. of Eastern Pa. v. Sec. of Labor, supra* (Philadelphia); *Joyce v. McCrane,* 320 F.Supp. 1284 (N.D.J.1970) (Newark); *Weiner v. Cuyahoga Community College District,* 19 Ohio St.2d 35, 249 N.E.2d 907 (1969), *cert. denied,* 396 U.S. 1004, 90 S.Ct. 554, 24 L.Ed.2d 495 (1970) (Cleveland); Affidavit of T. Michael Turner, Executive Director of plaintiff Association (Rhode Island). *See generally* Report, *supra* at 90; Note Employment Discrimination and Title VII of the Civil Rights Act of 1964, 84 Harv.L.Rev. 1109, 1275–1304 (1971). Those plans whose constitutionality have been reviewed, have received judicial approval. *E. g., United States v. New Orleans Public Service, Inc.,* 553 F.2d 459, 468 (5th Cir. 1977), *petition for cert. filed* 45 U.S.L.W. 3243 (1977); *Southern Illinois Builders Assoc. v. Ogilvie,* 471 F.2d 680 (7th Cir. 1972); *Altshuler, supra; Contractors Assoc. of Eastern Pa. v. Sec. of Labor, supra.*

Under the widespread referral system, discrimination in union halls is directly responsible for the limited job opportunities for minorities on construction projects. *Id.*

at 173; *see Weber v. Kraiser Aluminum & Chemical Corp.,* 563 F.2d 216, 237 (5th Cir. 1977) (Wisdom, dissenting). Barriers to work on construction projects, in turn, may well decrease the number of minorities sufficiently experienced to begin their own construction firms. Congress could reasonably infer that the lack of minority business enterprises was caused in part by the past discrimination in related unions documented in case after case.

In 1976, the House Committee on Small Business found that past discrimination, both on the part of lending institutions and surety bonding firms, had inhibited the growth of minority businesses. In addition, present business practices, racially neutral on their face, perpetuate the effects of past discrimination. Summary of Activities, 94th Cong., 2d Sess. (Comm.Print.1976) at 182. According to testimony before the Committee, surety firms practice "redlining" against minority businesses with devastating results, since all federal contracts require surety bonding. *Id.* at 183. Past discrimination has a particularly long-lasting effect when its remedy calls upon financial institutions to risk very large sums on inexperienced firms. Inexperience and lack of financial backing make it difficult for minority businesses to become competitive in bidding with the larger, more established firms. 123 Cong.Rec. H. 1437 (daily ed. Feb. 24, 1977) (comments of Rep. Mitchell); *see* Report at 9.

Taking all these factors into consideration, Congress could rationally conclude that some adjustment in the bidding requirements was necessary to ameliorate the effects of past and present discrimination.

■ Although the specific goal of the 1977 amendment was to remedy racial imbalance in contract awards, the goals of the original 1976 Act were to alleviate unemployment and stimulate the national economy by making grants to state and local governments to fund public works projects in the areas hardest hit by the current recession. H.R.Rep.No. 94–1077, 94th Cong.,2d Sess., reprinted in [1976] U.S.Code

Cong.& Admin.News 1747. The Act is particularly designed to stimulate employment in the construction industry, the "major victim of the current crisis" in unemployment, *id.* at 1746. In fact, Congress found that the unemployment figures in the construction industry were three times that of the general economy. H.R.Rep.No. 95–20, 95th Cong.,1st Sess., reprinted in [1977] U.S.Code Cong.& Admin.News 716. To assure that "pockets of poverty" would be reached, *id.* at 721, the 1976 Act also provided for grants to be targeted to neighborhoods of especially high unemployment. 42 U.S.C. § 6707(e) (1976). The figures of minority unemployment in the national economy generally (13.1 percent), and in the construction industry (20.3 percent), for 1976 are staggering. The fact that minority unemployment is dramatically worse than its nonminority counterpart (6.4, 11.9 percent respectively [16]) suggests an inference that past discrimination in education [17] and employment [18] against minorities still takes its toll. In companies with bona fide seniority systems and construction unions that base referrals for jobs on seniority, minorities with only recent experience will be the first to receive lay-off notices and the last to get job referrals. Consistent with the 1976 Act's design of targeting funds to the industry and locations with the worst unemployment, one purpose of the 1977 amendment is to target funds to that portion of the population, classified by race, suffering the worst unemployment. *See* 123 Cong. Rec.S. 3910 (daily ed. March 10, 1977) (comments of Sen. Brooke); 123 Cong.Rec.H. 1440 (daily ed. Feb. 24, 1977) (comments of Rep. Biaggi). That purpose, in combination with the goal of remedying the present racial imbalance in the award of government contracts, establishes a "compelling need."

3) To pass constitutional muster, the statute must survive a final, searching scrutiny of the means selected by Congress. All courts that have to date reviewed the constitutionality of this statute have applied the strictest scrutiny appropriate to any statute that establishes a suspect, racial classification. The majority of these courts have concluded that the statute satisfies both aspects of strict scrutiny—that a compelling interest justify the statute and that the racial quota be the least drastic alternative available to Congress, *Dunn v. Blumstein,* 405 U.S. 330, 337, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); *Loving v. Virginia,* 388 U.S. 1, 11, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967). This Court joins the majority of district courts in both conclusions.

■■■■ However, we also conclude that scrutiny of the means adopted need not be as strict in the context of a benign racial classification as in the context of an invidious racial classification. We have already established, one, that the statute does not stigmatize any race nor mask an invidious purpose behind a benign one, and, two, that a compelling need to remedy past discrimination exists. Once a statute has satisified both these tests, some adjustment down in the scrutiny of the means selected by Congress is warranted, at least when, as here, the racial quota does not burden another discrete, insular minority, *United States v. Carolene Products Co.,* 304 U.S. 144, 152 n. 4, 58 S.Ct. 778, 82 L.Ed. 1234 (1938), nor the

**16.** Current Population Survey, Department of Labor, Bureau of Labor Statistics, Tables 3A, 26A (unpublished data). No reliable data for Rhode Island is available.

**17.** *See, e. g., Swann v. Charlotte-Mecklenburg. Board of Education,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); *Griffin v. County School Board of Prince Edward County,* 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964); *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954); *McLaurin v. Oklahoma State Regents,* 339 U.S. 637, 70 S.Ct. 851, 94 L.Ed. 1149 (1950); *Sweatt v. Painter,* 339 U.S. 629, 70 S.Ct. 848, 94 L.Ed. 1114 (1950); *Cooper*

*v. Aaron,* 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958); *Gong Lum v. Rice,* 275 U.S. 78, 48 S.Ct. 91, 72 L.Ed. 172 (1927); *Missouri ex rel. Gaines v. Canada,* 305 U.S. 337, 59 S.Ct. 232, 83 L.Ed. 208 (1938); *Cumming v. County Board of Education,* 175 U.S. 528, 20 S.Ct. 197, 44 L.Ed. 262 (1899).

**18.** In addition to the cases cited *supra,* at 570–571; *see, e. g., Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); *Steele v. Louisville & N.R.R.,* 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944).

exercise of a constitutional right, *see, e. g., Linmark Associates, Inc. v. Township of Willingboro,* 431 U.S. 85, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1977); *Germann v. Kipp,* 429 F.Supp. at 133; Brest, *supra,* at 21.

This is the very approach followed by the First Circuit in *Altshuler* in reviewing a quota for minority employment. Satisfied that a "compelling need" to correct racial imbalance existed, the First Circuit required only that the racial quota be "reasonably related" to achieving that end, 490 F.2d at 18. Although no explanation of why the Court declined to apply the least drastic means component of the compelling interest test was forthcoming, the justification must turn on the benign character of the racial classification. Examination of the actual review of the means undertaken by the *Altshuler* Court [19] suggests that a level of scrutiny is commanded which is less than that accorded invidious racial classifications and which is more than the standard minimum rationality test appropriate for racially neutral legislation, *see, e. g., Katzenbach v. Morgan,* 384 U.S. at 650–51, 86 S.Ct. 1717, *quoting McCulloch v. Maryland,* 4 Wheat. 316, 421, 4 L.Ed. 579 (1819); *cf. Craig v. Boren,* 429 U.S. 190, 197, 97 S.Ct. 451, 50 L.Ed.2d 397 (Court), 211–12, 97 S.Ct. 451 (Stevens, J., concurring). *See generally,* Gunther, Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection, 86 Harv.L. Rev. 1 (1972).

▮ The remedy selected by Congress is clearly "reasonably related" to the objectives of correcting racial imbalance in government contract awards, stimulating the growth of minority businesses generally, and alleviating dramatically higher unemployment among minorities. Awarding government contracts has a multiple effect way beyond the actual work opportunity provided by a single award. The opportunity for a new contracting firm to demonstrate on-the-job competence and gain experience will open new doors at lending institutions, surety firms and private contractors and employers. Handbook, *supra,* at 1–2. The success and growth of existing minority businesses will in turn stimulate new minority enterprises. Lastly, providing work for minority contractors is directly related to improving opportunities for minority employment generally. Congress could reasonably conclude that a minority business would at the very least not discriminate against minority workers. Moreover, geographical location and racial identity of minority businesses are likely to attract more minority workers. *See* 123 Cong.Rec.S. 3910 (daily ed. March 10, 1977) (comments of Sen. Brooke).

▮ The 10 percent requirement is reasonable as a national average. Although all legislative line-drawing is arbitrary, 10 percent is not an unrealistic goal since minorities constitute 17 percent of the population. Reasonable overoptimism is permissible. *Altshuler,* 490 F.2d at 19. Although a requirement based on a ratio to the project area minority population might be the most closely tailored remedy, Congress has chosen to shift the burden of demonstrating that the 10 percent quota is impracticable upon the local grantee. A grantee may request a complete or partial waiver after all feasible efforts to use qualified minority business enterprises have been exhausted and based on the minority population and business pool in the project area. 42 Fed.Reg. 27, 434–35 (1977) (to be codified in 13 C.F.R. sec. 317.99) promulgated by the Secretary of Commerce pursuant to 42 U.S.C. § 6706, interpreted in Guidelines (June, 1977) *supra,* at 30–31.[20] In

---

19. In testing the reasonable relationship of the 20 percent employment quota, the Court examined whether the figure was unrealistic, leaving room nonetheless for a little over optimism, whether it required contractors to employ unqualified minority workers, and whether there was sufficient opportunity to contest the accusation of non-compliance with the quota. Satisfied on all counts, the Court upheld the quota.

20. The capacity to request a waiver is properly vested in the grantee rather than the individual contractor. Only the grantee is in a position to evaluate the feasibility of satisfying the 10 percent requirement based upon whether any bidder has been able to submit a responsive bid. If no bidder has been successful, it is in the interest of the grantee as well as the bidders to seek a waiver.

light of the industry's past recalcitrance, the failure of voluntary programs, and the need to quickly inject the project funds into the economy, Congress could reasonably shift the burden onto the industry. *See South Carolina v. Katzenbach,* 383 U.S. at 328, 86 S.Ct. 803. The 10 percent requirement is tailored with respect to time as well, since it will terminate in December, 1978 when the appropriations run out. Obviously, if a compelling need for remedying racial imbalance should cease to exist at the time of congressional reenactment, an unlikely event indeed, the extension of a racial quota could not be sustained. *See Altshuler,* 490 F.2d at 18 n. 16. Lastly, the statute does not impose an unreasonable burden upon the contractor to hire *unqualified* minority businesses, Guidelines (Aug.1977), *supra,* at 3, nor to hire beyond the "reasonable trade area," 13 C.F.R. 317.19(b)(2). *See Altshuler,* 490 F.2d at 18. In sum, because the 10 percent requirement is both realistic and flexible, this Court concludes that the remedy is reasonably and substantially related to the goal of correcting racial imbalance.

■ Even if the 10 percent requirement is subject to the strictest scrutiny, the remedy selected represents the least drastic alternative available to Congress. The majority of courts have agreed, based on substantial evidence, that other, less restrictive means have actually been tried and failed. *E. g., Ohio Contractors Assoc. v. E. D. A., supra,* at 20. Congress need not exhaust every conceivable option before adopting an

approach likely to be the most effective. Since March, 1969, fostering minority businesses has been a national policy, Executive Order 11458. To further that policy, programs providing loans and assistance in other forms to minority businesses, and programs imposing obligations upon government contractors to use their "best efforts" to obtain minority subcontractors have all been implemented.[21] Although the list of programs is impressive, the low percentage of minority business enterprises obtaining government contracts persists.[22] Several government studies have observed that voluntary goals of minority subcontracting have not been adequately enforced and, as a consequence, have been totally ineffective. Report, *supra,* at 91; *see* Department of Defense Program to Help Minority-run Businesses Get Subcontracts Not Working Well, Report of the Comptroller General of the U.S., at 19 (February, 1977). Pursuant to Executive Order 11246, as of 1975, sixty-two voluntary "hometown" plans for the hiring of minorities had been adopted by local contractors associations. However, in seven instances, mandatory plans were imposed by the Secretary of Labor because of the ineffectiveness or inadequacy of the voluntary plan. Report, *supra,* at 90. *See, e. g., Rossetti Contracting Co., Inc. v. Brennan,* 508 F.2d 1039, 1044 (7th Cir. 1975); *see* Employment Discrimination, *supra,* 84 Harv.L.Rev. at 1295. To be effective, any remedy must require the prime contractor to provide subcontracting opportunities to minority businesses. The vast majority of

Any due process rights the *Altshuler* Court recognized grew out of the threat of sanctions imposed upon a contractor after he had been awarded a contract for failure to comply with the employment quota in his actual performance.

21. *See* programs described in *Constructors Association of Western Pa. v. Kreps,* at n. 8; Report, *supra.* In *Fullilove v. Kreps,* 443 F.Supp. 253 at n. 14, the Court writes that the Secretary of Commerce asserted that 35 programs were in operation. Representative Mitchell proposed the amendment precisely because all these programs had failed to increase the number of contracts awarded to minority businesses. 123 Cong.Rec.H. 1436 (daily ed. Feb. 24, 1977). His sentiments were reiterated

on the floor of the Senate by Senator Brooke, 123 Cong.Rec.S. 3910 (daily ed. March 10, 1977).

22. Some progress has been made in the area of federal procurement contracts. In 1969, minority businesses only received $12.7 million in awards. In 1974, they received $701 million, according to the Interagency Report promulgated by the Office of Management and Budget, *supra,* at 3; a more modest estimate of $394 million was proffered in the Report of the Commission on Civil Rights, *supra,* at 6. Despite these gains, minority businesses still received, based on the more optimistic figure, only 1.2 percent of the $57.5 billion awarded for federal procurement contracts in 1972. *Id.* at 6.

minority businesses are small, specialty contractors with whom government agencies rarely contract directly. Report, *supra,* at 9. Imposition upon prime contractors of a mandatory minority business enterprise quota with adjustments for local situations through the waiver provision is the only effective means available to Congress.

### The Thirteenth Amendment

The Thirteenth Amendment [23] "(b)y its own unaided force and effect . . . abolished slavery, and established universal freedom . . . ." and "clothes congress with power to pass all laws necessary and proper for abolishing all badges and incidents of slavery in the United States . . . ." *Civil Rights Cases,* 109 U.S. 3, 20, 3 S.Ct. 18, 28, 27 L.Ed. 835 (1883).

At the end of the Civil War, Congress undertook to protect the newly freed slaves from discrimination by the state and private persons and to eliminate the badges and the incidents of slavery through the enactment of the Civil Rights Acts of 1866, ch. 31, 14 Stat. 27–30; 1870, ch. 114, 16 Stat. 140–46; 1871, ch. 22, 17 Stat. 13–15; and 1875, ch. 114, 18 Stat. 335–37. It undertook in other legislation to aid black persons through the provision of relief, social services and education. *See* Freedman's Bureau Act, ch. 200, 14 Stat. 173–77 (1866). While the goal, held by some Republicans, of "40 acres and a mule" for freed slaves was not achieved, the Government attempted to establish the self-sufficiency of some freed slaves by the distribution and sale of land for homesteads.[24]

The Court in the *Civil Rights Cases* reasonably concluded that a time must come when the last vestiges of slavery will have been eliminated. The Court wrote,

When a man has emerged from slavery, and by the aid of beneficent legislation has shaken off the inseparable concommitants of that state, there must be some stage . . . when . . . his rights as a citizen . . . are to be protected in the ordinary modes by which other men's rights are protected. *Civil Rights Cases,* 109 U.S. at 25, 3 S.Ct. at 31.

This is true. There will be a day when the burdens of prior discrimination have been eased and then erased. The vision of the Thirteenth and the Fourteenth Amendments [25] of a society free of racial inequality, color-blind, in which differences among persons arise from merit alone, will be realized.[26]

23. The Thirteenth Amendment reads:
Section 1. Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted shall exist within the United States, or any place subject to their jurisdiction.
Section 2. Congress shall have power to enforce this article by appropriate legislation.

24. *See,* K. Stampp, The Era of Reconstruction 1865–1867 (1965). *Cf. Commonwealth of Pa. v. Local U. 542, Int. U. of Op. Eng.,* 388 F.Supp. 155, 163–67, 179 (E.D.Pa.1974); *Cornelius v. Benevolent Protective Order of Elks,* 382 F.Supp. 1182, 1200, n. 26 (D.Conn.1974).

25. In the final speech before the House of Representatives voted in favor of the Fourteenth Amendment, Thaddeus Stevens described his vision (which, he believed, the Civil War Amendments would only dimly realize):
In my youth, in my manhood, in my old age, I had fondly dreamed that when any fortunate chance should have broken up for awhile the foundation of our institutions, and released us from obligations the most tyrannical that ever man imposed in the name of freedom, that the intelligent, pure and just men of this Republic, true to their professions and their consciences, would have so remodeled all our institutions as to have freed them from every vestige of human oppression, of inequality of rights, of the recognized degradation of the poor, and the superior caste of the rich. In short, that no distinction would be tolerated in this purified Republic but what arose from merit and conduct.
*Quoted in* Bickel, The Original Understanding and the Segregation Decision, 69 Harv.L.Rev. 1, 54–55 (1955).

26. The First Amendment religious clause embodies an analogous vision: a diverse country free of balkinization and the divisiveness of struggle among religious groups. The visions of the First and Fourteenth Amendments differ in that the First Amendment successfully prevented religious prejudices from deeply embedding themselves in our social fabric, by creating a wall of separation which limited divisive national political struggles among religious groups. By contrast, the seeds of struggle and division over slavery were embedded in the Constitution·at the same time that the wall of

That time is not yet come. The power of Congress to legislate to eradicate the vestiges of slavery, its badges and incidents, remains in force today as it did over 100 years ago. *Jones v. Alfred Mayer Co.,* 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968).[27] "The Constitutional imperative to eliminate the badges of slavery has not dimmed in the 114 years since President Lincoln issued the Emancipation Proclamation." *Brown v. Dade Christian Schools, Inc.,* 556 F.2d 310, 324 (5th Cir. 1977) U.S. App.Pend. (Judge Goldberg concurring). The reason for this is that current

> racist acts are as related to the incidents of slavery as each roar of the ocean is related to each incoming wave. For slavery was an institution which was sanc-

tioned, sustained, encouraged and perpetuated by federal constitutional doctrine. Today's conditions on [sic] race relations are a sequelae and consequence of the pathology created by this nation's two and a half centuries of slavery.

*Commonwealth of Penn. v. Local Union No. 542, Int. U. of Operating Engineers, 347 F.Supp. 268, 299 (E.D.Pa.1972) (Judge Higginbotham).*

Current discrimination against black persons is a relic of slavery: "when racial discrimination herds men into ghettos and makes their ability to buy property turn on the color of their skin, then it too is a relic of slavery." *Jones v. Alfred Mayer,* 392 U.S. at 442–43, 88 S.Ct. at 2205.[28]

---

separation was erected to avoid religious competition. Our Union was split asunder by that struggle. The wounds remain today of that racism which fueled political struggles up until the Civil War Amendments attempted to foreclose those rifts once and for all. But those wounds continue to block the realization of the color-blind society the Fourteenth Amendment envisions.

Ours is a nation of foreigners, immigrants and minorities. Religious groups have found a home here, free to enjoy their varied practices and beliefs, secure that they need not struggle in the political arena for their survival. So, too, immigrant groups have found a home here where they can practice both diverse and uniquely American ways. Although some struggle has marked the entry of all minority groups into our society, the constitutional assurance of the equal protection of the laws has promised a broader American identity to all these groups. Protecting that promise of equality before the law is essential. Nonetheless, the Thirteenth Amendment, by its history, singles out one group, former slaves, as to whom the Government can take special pains to assure the equal application of the laws and give aid in securing them a competitive position in society. The justification is historical, stemming from the enforced immigration to this country, the destruction of former ties and ways of living, the severe conditions of slavery, the exploitation of slaves which made them as much as any the builders of southern society. The justification is strengthened by the denial of the equal protection of the laws, sanctioned by the Supreme Court and Congress, long after the equal protection clause of the Fourteenth Amendment guaranteed to others rights denied the black person.

**27.** *See Sullivan v. Little Hunting Park, Inc.,* 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969) (§ 1982); *Griffin v. Breckenridge,* 403 U.S. 88,

105, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971) (§ 1985(3)); *Tillman v. Wheaton-Haven Recreational Ass'n., Inc.,* 410 U.S. 431, 439–40, 93 S.Ct. 1090, 35 L.Ed.2d 403 (1973) (§§ 1981, 1982); *Johnson v. Railway Express Agency,* 421 U.S. 454, 459–60, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975) (§ 1981); *Runyon v. McCrary,* 427 U.S. 160, 168–75, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976) (§ 1981); *McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. 273, 285–96, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976) (§ 1981); *District of Columbia v. Carter,* 409 U.S. 418, 421–25, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973) (§ 1982); *Palmer v. Thompson,* 403 U.S. 217, 226–27, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971); *see also Dombrowski v. Dowling,* 459 F.2d 190, 195 (7th Cir. 1972) (Judge Stevens); *Spiess v. C. Itoh Co. (America), Inc.,* 408 F.Supp. 916, 919–930 (S.D.Tex.1976); Buchanan, The Quest of Freedom: A Legal History of the Thirteenth Amendment (1976) from articles appearing serially in 12 Houston L.Rev. (1976); tenBroek, Thirteenth Amendment to the Constitution of the United States, 39 Calif.L.Rev. 171 (1951); Note, Federal Power to Regulate Private Discrimination: The Revival of the Enforcement Clauses of the Reconstruction Era Amendments, 74 Colum.L.Rev. 449 (1974); Larson, The Development of Section 1981 as a Remedy for Racial Discrimination in Private Employment, 7 Harv.Civ.Rts.Civ.Lib.L.Rev. 56 (1972); Note, The "New" Thirteenth Amendment: A Preliminary Analysis, 82 Harv.L.Rev. 1294 (1969); Note, *Jones v. Mayer:* The Thirteenth Amendment and the Federal Anti-Discrimination Laws, 69 Colum.L.Rev. 1019 (1969).

**28.** Justice Douglas has written, "Some badges of slavery remain today. While the institution has been outlawed, it has remained in the minds and hearts of many white men." *Jones v. Alfred Mayer,* 392 U.S. at 445, 88 S.Ct. at

When the Supreme Court stated in the *Civil Rights Cases* that a time must come when every citizen takes his place before the law without governmental awareness or sensitiveness to his race, it was anticipating that the time would soon be reached. How anomalous that it spoke these words when national political alignments were returning control of the South to white interests which had little regard for racial equality.[29] Simultaneously, a system of sharecropping was taking hold which would reimpose the severest restrictions on black peoples' freedom.[30] Only a few years before, Congress had reviewed specific findings of rampant violence and discrimination against black persons and passed protective legislation.[31] Yet, the effect of the Court's decisions in *U. S. v. Harris,* 106 U.S. 629, 1 S.Ct. 601, 27 L.Ed. 290 (1882) and the *Civil Rights Cases, supra,* was to put much private racial discrimination beyond the reach of federal law.[32] Soon the Court would turn a blind eye to the state reimposition of white supremacy and, in effect, give its constitutional imprimatur. *Plessy v. Ferguson,* 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896); *see Cumming v. County School Board, Richmond County, Ga.,* 175 U.S. 528, 20 S.Ct. 197, 44 L.Ed. 262 (1899).

The "promise of freedom," *Jones v. Alfred Mayer,* 392 U.S. at 443, 88 S.Ct. 2186, of the Thirteenth Amendment was not realized then. The consequences of that failure remain and continue to vest in Congress power under the Thirteenth Amendment § 2 not only to ban invidious discrimination but to take affirmative steps to eradicate the last vestiges of the badges and incidents of slavery.

Congress has exercised that power in several important ways. Legislation under the Thirteenth Amendment assures to all: the same right as is enjoyed by white citizens to make and enforce contracts, to sue, and to obtain the full and equal benefit of the laws, 42 U.S.C. § 1981; the same right to "inherit, purchase, lease, sell, hold, and convey real and personal property," 42 U.S.C. § 1982; and the right to be free of conspiracies to deprive them, on the basis of invidious discrimination, of the equal protection of the laws, 42 U.S.C. § 1985(3).[33] Section

---

2206 (Douglas, J., concurring) (see his list of Supreme Court cases at 445–48 which testify to the pervasiveness of discrimination). *See,* The Civil Rights Cases, 109 U.S. at 36, 43, 3 S.Ct. 18 (Harlan, J., dissenting); *Dombrowski v. Dowling,* 459 F.2d at 195; *NAACP v. Lansing Bd. of Education,* 429 F.Supp. 583, 586–89, 637–39 (W.D.Mich.1976).

**29.** C. Woodward, Reunion and Reaction (1951).

**30.** W. Miller, A History of the United States (1958) at 257–60; G. Myrdal, An American Dilemma, Vol. 2 (1944), at 577–82.

**31.** *See,* Report of C. Shurz, S.Exec. Doc. No. 2, 39th Cong., 1st Sess., 2, 17–25, *cited in Jones v. Alfred Mayer,* 392 U.S. at 428, 88 S.Ct. 2186; Note, Developments in the Law—Section 1983 and Federalism, 90 Harv.L.Rev. 1133, 1153–54 (1977).

**32.** *See,* Note, Developments in the Law—Section 1983 and Federalism, 90 Harv.L.Rev. at 1158–61.

**33.** Congress also passed Title VI of the Civil Rights Act of 1964, Pub.L. 88–352, § 601 et seq., 78 Stat. 252 (1964), 42 U.S.C. § 2000d et seq. (1970), pursuant, in part, to its Thirteenth Amendment power. *United States v. Jefferson County Bd. of Educ.,* 372 F.2d 836, 856 (5th Cir.

1966), *cert. denied,* 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103 (1967). It directed that no person, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program receiving Federal financial assistance. In 1977, Congress took a more direct and concerted approach, by means of the minority business enterprise requirement, to prevent the exclusion of minorities from the benefits of the federal public works program.

In addition, drawing partially on its Thirteenth Amendment powers, Congress enacted the Civil Rights Act of 1968, Title VIII, Pub.L. 90–284, § 801 et seq., 82 Stat. 81 (1968), 42 U.S.C. § 3601 et seq. (1970), which protects the right not to be discriminated against in the purchase or rental of property and in the conditions of such transactions on account of race, color, religion, or national origin. The Act also forbids blockbusting techniques and discrimination in financing. *See, Williams v. Matthews Co.,* 499 F.2d 819, 825 (8th Cir. 1974), *cert. denied,* 419 U.S. 1021, 95 S.Ct. 495, 42 L.Ed.2d 294; *U. S. v. Bob Lawrence Realty, Inc.,* 474 F.2d 115, 120–21 (5th Cir. 1973), *cert. denied,* 414 U.S. 826, 94 S.Ct. 131, 38 L.Ed.2d 59; *U. S. v. Hunter,* 459 F.2d 205, 214–15 (4th Cir. 1972), *cert. denied,* 409 U.S. 934, 93 S.Ct. 235, 34 L.Ed.2d 189; *Zuch v. Hussey,* 394 F.Supp.

1981 protects black persons from being discriminated against in the making of contracts, including employment contracts, by private persons as well as by local, state and federal governments. Section 1981 assures not just freedom from overt discrimination with invidious intent but also protects against an inequality of results, for under its Thirteenth Amendment power, Congress created a provision which, to use the Supreme Court's words from another context, outlaws "sophisticated as well as simple-minded modes of discrimination," *Lane v. Wilson,* 307 U.S. 268, 275, 59 S.Ct. 872, 876, 83 L.Ed. 1281 (1939) (Fifteenth Amendment).

Thus § 1982, the twin of § 1981, *see Tillman v. Wheaton-Haven Rec. Ass'n, Inc.,* 410 U.S. at 439–40, 93 S.Ct. 1090, has been held to forbid more than intentional discrimination. It looks behind a legal and formal. equality to guarantee that black persons are in fact receiving equal treatment. In the case of *Clark v. Universal Builders,* 501 F.2d 324 (7th Cir. 1974), *cert. denied,* 419 U.S. 1070, 95 S.Ct. 657, 42 L.Ed.2d 666, the district court found that, as a result of racial prejudice, a dual housing-market existed, which confined blacks to one market, marked by severe shortages and higher prices, and whites to another. The defendant housing developers sold housing to black persons at higher prices and for a higher profit than they obtained from sales to white persons in other parts of the city. The court found that the defendants were not motivated by racially discriminatory purposes but only by the profit motive to charge what the market would bear. This would ordinarily be a legitimate business purpose. Nonetheless, the circuit court found that the defendants' differential pricing violated § 1982 which forbids the exploitation of "a situation created by socioeconomic forces tainted by racial discrimination." *Id.* at 330. The circuit court endorsed the district court's interpretation of *Jones v. Alfred Mayer:* "[The Supreme Court] found that the legislative history of the 1866 Act demonstrated the Congressional intent to ensure that the former slaves could participate fully in a national economy. It was the Court's conclusion that the existence of a black market distinct from a white market was the *de facto* vestige of what the Congress in 1866 intended to abolish as a critical means of making the black man a free man." *Contract Buyers League v. F & F Investment,* 300 F.Supp. 210, 215 (N.D.Ill.1969); *Cf. Ortega v. Merit Ins. Co.,* 433 F.Supp. 135 (N.D.Ill.1977); *Resident Advisory Bd. v. Rizzo,* 425 F.Supp. 987, 1031–21, 1026–27 (E.D.Pa.1976); 429 F.Supp. 222 (1977), modified 564 F.2d 126 (3rd Cir. 1977) cert. denied 435 U.S. 908, 98 S.Ct. 1458, 55 L.Ed.2d 499.

■ Turning to the legislative action before us today, it is clear that under the Thirteenth Amendment Congress can remedy discrimination in the letting of contracts and the hiring of workers with federal monies; and it can eliminate the vestiges of the badges and incidents of slavery which place black businessmen and workers in disadvantageous positions when they compete for those monies. Congress has already done just that by the private damage action for discrimination, § 1981.

But Congress need not depend on private parties, using § 1981, to police the award of contracts. Congress can take more determined, more concerted action to aid black business persons and workers. Under a remedial theory, Congress can create the conditions under which minority businesses,

---

1028, 1047 (E.D.Mich.1975); *Brown v. State Realty Co.,* 304 F.Supp. 1236, 1240 (N.D.Ga. 1969); *U. S. v. Mintzes,* 304 F.Supp. 1305, 1312–13 (D.Md.1969).

In 1976, Congress exercised its power under the Thirteenth Amendment when it authorized attorney fees in civil rights litigation, Pub.L. 94–559, § 2, 90 Stat. 2641 (1976), 42 U.S.C. § 1988 (1977). *See Bond v. Stanton,* 555 F.2d 172, 175 (7th Cir. 1977).

Congress exercised its Thirteenth Amendment powers in other contexts as well. It outlawed peonage in the Anti-Peonage Act, 42 U.S.C. § 1994 (1970). Congress may also have enacted the predecessor to 18 U.S.C. § 241 (1970), the criminal counterpart of 42 U.S.C. § 1985(3), at least in part pursuant to its Thirteenth Amendment powers. *See U. S. v. Price,* 383 U.S. 787, 805, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966).

long hindered by the effects of past discrimination, have an opportunity to become self-supporting and competitive so they too can competitively participate in a national economy. Or it may conclude that present day private discrimination is so pervasive that market competition cannot be depended upon to assure a fair distribution of contracts. Congress may then act directly to assure that black persons get their fair-share of the distribution of federal monies. The 10 percent requirement is an "appropriate" and effective means to achieve these purposes. For the factual bases of this conclusion, *see* "Scrutiny of the Racial Classification, ¶ 3," *supra.*

The impact of the 10 percent minority business enterprise requirement on contractors is similar to the impact of the holding in *Clark v. Universal Builders, supra,* on housing developers. There the developers were prevented from profiting to the full extent market competition would permit, since such success would derive from "a situation created by socioeconomic forces tainted by racial discrimination." Rather, they were forced to give up some of their potential profit for the benefit of minority home-buyers. Here, Congress has declared that white contractors may not reap 100 percent of the benefits of governmental contracts merely because they can outbid minority contractors in a situation also created by socioeconomic forces tainted by racial discrimination.

The Supreme Court has written:

Negro citizens, North and South, who saw in the Thirteenth Amendment a promise of freedom . . . would be left with "a mere paper guarantee" if Congress were powerless to assure that a dollar in the hands of a Negro will purchase the same thing as a dollar in the hands of a white man.

*Jones v. Alfred Mayer,* 392 U.S. at 443, 88 S.Ct. at 2205 (footnote omitted).

It would be a mere paper guarantee if Congress were powerless to assure the black person [34] an equal chance to earn that dollar.

■ This is a case of first impression. We rely on the Supreme Court's conclusion that discrimination in the making of various contracts is a badge and incident of slavery. *Cf. Jones v. Alfred Mayer,* 392 U.S. at 441–43, 88 S.Ct. 2186; *Tillman v. Wheaton-Haven Rec. Ass'n, Inc.,* 410 U.S. at 439–40, 93 S.Ct. 1090. This merely affirmed the determination Congress already made, pursuant to its Thirteenth Amendment power to decide what constitutes a badge and incident. Such a Congressional determination is subject to a judicial review which employs the minimum rationality standard. *Jones v. Alfred Mayer,* 392 U.S. at 440, 88 S.Ct. at 2203. ("Surely, Congress has the power under the Thirteenth Amendment rationally to determine what are the badges and incidents of slavery . . . .").

**34.** The minority business enterprise provision at issue includes other minority groups in addition to black persons. On the facts of this case, we need not decide the applicability or inapplicability of this Thirteenth Amendment analysis to other groups. *See Jones v. Alfred Mayer,* 392 U.S. at 435, 88 S.Ct. 2186; *Griffin v. Breckenridge,* 403 U.S. at 102 n.9, 91 S.Ct. 1790; *Pendrell v. Chatham College,* 370 F.Supp. 494 (W.D.Pa.1974).

For the applicability of § 1981 to Mexican American or Spanish-surnamed persons who did not suffer slavery, see *Castro v. Beecher,* 459 F.2d 725, 728–32 (1st Cir. 1972); *Gomez v. Pima County,* 426 F.Supp. 816, 818–19 (M.D. Ala.1976); *League of U. Latin Am. Citizens v. City of Santa Clara,* 410 F.Supp. 873 (C.D.Calif. 1976); *Sabala v. Western Gillette, Inc.,* 362 F.Supp. 1142, 1147 (S.D.Tex.1973), *modified* 516 F.2d 1251 (5th Cir. 1975); *Guerra v. Man-*

*chester Terminal Corp.,* 350 F.Supp. 529, 533–38 (S.D.Tex.1972) *aff'd* 498 F.2d 641, 653–54 (5th Cir. 1974); *Godbolt v. Hughes Tool Co.,* 63 F.R.D. 370, 373–74 (S.D.Tex.1972); *cf. Hernandez v. Texas,* 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954); *Takahashi v. Fish and Game Comm'n,* 334 U.S. 410, 419–20, 68 S.Ct. 1138, 92 L.Ed. 1478 (1948); *Spiess v. C. Itoh & Co.,* 408 F.Supp. 916 (S.D.Tex.1976); *Sud v. Import Motors Ltd.,* 379 F.Supp. 1064, 1071–72 (W.D. Mich.1974). *Contra Nat. Assn. of Government Employees v. Rumsfeld,* 413 F.Supp. 1224, 1228 (D.D.C.1970) *aff'd* 556 F.2d 76 (D.C.Cir.1976). We also note that the Supreme Court, employing a rationality standard, has reviewed the use of a benign classification as to Indian employment and has upheld it under Congress' plenary power to determine relations with Indian tribes. *Morton v. Mancari,* 417 U.S. 535, 551–55, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974).

The standard for judicial review of the means adopted by Congress to eliminate badges and incidents is given by the Thirteenth Amendment § 2: appropriateness. The Supreme Court appears to treat this standard as one of minimum rationality, similar to the standard enunciated in *McCulloch v. Maryland,* 4 Wheat. 316, 421, 4 L.Ed. 579 (1819). *See Jones v. Alfred Mayer,* 392 U.S. at 440–41, 443–44, 88 S.Ct. at 2205. ("Surely, Congress has . . . the authority to translate that determination [of what is a badge and incident] into effective legislation. Nor can we say that the determination Congress has made is an irrational one."); *Griffin v. Breckenridge,* 403 U.S. at 105, 91 S.Ct. 1790; *Brown v. State Realty Co.,* 304 F.Supp. 1236, 1240 (N.D.Ga. 1969).

▪ Here, however, the means adopted include a racial classification; this requires more searching scrutiny. Because of the historic relationship between the Thirteenth Amendment and race, and because the Fourteenth Amendment, though passed subsequently to the Thirteenth Amendment, was thought to expand, not contract, Congressional power, *see* tenBroek, Thirteenth Amendment to the Constitution of the United States, 39 Calif.L.Rev. 171, 200–202 (1951), we do not simply subject Congressional use of a racial classification under the Thirteenth Amendment to a heightened equal protection scrutiny. Rather, we necessarily develop the standard of review from the nature of the Thirteenth Amendment itself.

▪ First, the Thirteenth Amendment makes the elimination of a badge or incident of slavery *per se* a compelling state interest. Second, when it reviews the means adopted in a spending program, this Court does not ask whether those methods are "reasonably related," *cf. Altshuler, su-*

*pra,* to remedying the effects of past discrimination only in the sector of society toward which the remedy is aimed; nor does it require a prior factual-finding of discrimination in that sector. For action under the Thirteenth Amendment aims at the elimination of a general, pervasive and historical discrimination resulting from slavery. Thus Congress can seek to attack discrimination in any number of ways, at any number of points in the economy. Congress can adopt a remedy directed toward inequality in one sector of the economy because a remedy so directed might be particularly swift and successful in reaching racial discrimination, without first making a prior finding of particular discrimination in that sector. It is possible, for example, that racial imbalance in a particular sector derives entirely from educational discrimination for which the people in that sector are not directly responsible. All that is required is that the spending program be reasonably and significantly related to eliminating the general and pervasive discrimination arising from slavery.

▪ This Court is duly mindful that today's conclusion sanctions, under the Thirteenth Amendment, the broad use of race-conscious remedies in spending programs. Limitations, both political and constitutional do exist. A white majority controls Congress at present and for the foreseeable future; the danger of any abuse of the power to enact benign racial classifications is therefore not substantial. *See* Ely, The Constitutionality of Reverse Racial Discrimination, 41 U. of Chi.L.Rev. 723 (1974). Further there are limits as to what constitutes a badge and incident of slavery.[35] Moreover, a racial classification that would burden another discrete and insular minority, *United States v. Carolene Products Co.,* 304 U.S. 144, 152 n.4, 58 S.Ct. 778, 82 L.Ed. 1234 (1938), or burden the exercise of a

---

**35.** Whatever limit interests in privacy, freedom of association and the like place on Congressional power to define a badge and incident of slavery, that limit is not in issue here. *See Runyon v. McCrary,* 427 U.S. at 175–79, 96 S.Ct. 2586 (Court); at 211, 96 S.Ct. at 2613 (White, J., dissenting) ("A racially motivated refusal to hire a Negro or a white babysitter or to admit a Negro or a white to a private associ-

ation cannot be called a badge of slavery . . . "); *Tillman v. Wheaton-Haven Rec. Ass'n,* 410 U.S. at 438–39, 93 S.Ct. 1090; *Sullivan v. Little Hunting Park,* 396 U.S. at 236, 90 S.Ct. 400; *Brown v. Dade Christian Schools, Inc., supra;* Note, Section 1981 and Private Groups: The Right to Discriminate versus Freedom from Discrimination, 84 Yale L.J. 1441 (1975).

constitutional right, would run afoul of the equal protection guarantee of the Fifth and Fourteenth Amendments, especially where that classification rationally but only minimally promoted Thirteenth Amendment goals. Cf. *Oregon v. Mitchell,* 400 U.S. at 128–29, 91 S.Ct. at 267 (Black, J.) (Congress cannot "undercut the amendment's guarantees of personal equality and freedom from discrimination . . ."); *Katzenbach v. Morgan,* 384 U.S. at 651–52 n.10, 86 S.Ct. 1717; *Barrick Realty, Inc. v. City of Gary, Indiana,* 491 F.2d 161, 164–65 (7th Cir. 1974); Buchanan, *The Quest for Freedom, A Legal History of the Thirteenth Amendment* at 161–62.

### Conclusion

Congress in its considered judgment determined that it must pin-point its monies in construction contracts to be sure that minority businesspersons and workers do not suffer discrimination. This Court has performed its judicial function by reviewing the constitutionality of the Act, giving due deference to the legislative judgment of Congress. It has found that the Congress permissibly employed a racial classification to further its legitimate purposes under the spending power of remedying inequality and under the Fourteenth Amendment § 5 of preventing governmental involvement in discriminatory practices. The classification employed was benign, in fact, and served the compelling interest of remedying the past and present discrimination which Congress found to exist. The means it adopted survive the strictest scrutiny in that they were found to be the only effective means remaining after others had failed. However, this Court found that only a reasonable relationship in fact between means and ends is required, where a benign classification is employed. In addition, this Court found that the minority business requirement was an "appropriate" exercise of Congress' Thirteenth Amendment § 2 power to remedy badges and incidents of slavery, namely discrimination in the letting of business contracts.[36]

A federal court has special responsibility in safeguarding the strictures of the Civil

---

**36.** Today, this Court upholds the constitutionality of the minority business enterprise provision on its face. Although plaintiffs have not claimed that the statute, while constitutional on its face, cannot be constitutionally applied to the Rhode Island construction industry, we shall briefly address such an attack. An as-applied attack might take two forms. First, the plaintiffs might have argued that Congress cannot remedy discrimination in states or locales where no discrimination has in fact occurred or been proved. Second, plaintiffs might have argued that the 10 percent figure is not feasible; and that it is not reasonably related to and is, in fact, altogether unreasonable in light of Rhode Island's minority population of 3.4 percent. See General Population Characteristics of Rhode Island, 1970 Census, United States Dept. of Commerce, Bureau of the Census, Table 18 at 41–28–29. Plaintiffs have raised neither of these as-applied claims.

1) With regard to the first as-applied argument, we initially note that this Court has today approved the facial constitutionality of the minority business enterprise requirement despite the fact that the requirement does not provide for a waiver upon proof that the industry in the local trade area has not engaged in discriminatory practices. We have done so on the basis of Congress' broad powers under the spending power and Amendment 14 § 2 and especially on the basis of Congress' power under the Thirteenth Amendment to remedy general and pervasive discrimination. The absence of such a waiver provision is "reasonably related" to Congress' objectives. To afford a local association or an individual contractor an opportunity to prove that the trade area is innocent of discrimination in an administrative hearing in each of the 8,591 public works projects (Agreed Statement of Facts, at 5) would totally frustrate the objective of quickly infusing federal dollars into the most economically depressed portions of the population and industry. Cf. *Califano v. Jobst,* 434 U.S. 47, 98 S.Ct. 95, 54 L.Ed.2d 228 (1977). Moreover, even judicial remedies for past discrimination can burden persons innocent of discrimination. *Franks v. Bowman,* 424 U.S. at 773–79, 96 S.Ct. 1251. A fortiori, Congress, which paints with a broader brush, can similarly adopt a remedial scheme that, to be effective, necessarily involves contractors who may in fact be innocent of the discrimination practiced by the industry region-wide or even nationwide. The discrimination in the construction industry is a national phenomenon calling for a national remedy. In addition to these practical considerations, which assure the facial validity of the provision, there is a serious question of whether contractors can claim exemption from a national remedial program based simply upon their individual innocence of past discriminatory practices when the program burdens no consti-

War Amendments and the Fifth Amendment. In the long-run, it must protect the vision of a color-blind society free of legal divisions based on the color of one's skin and the origin of one's family. But it would be wishful thinking to believe that a color-blind society can be created in a short time.

This country once called a halt in its progression toward a racially equal society. Only twenty years after the Emancipation Proclamation, Justice Bradley wrote, in a Supreme Court decision which put many acts of private discrimination beyond the reach of federal law, that "It would be running the slavery argument into the ground to make it apply to every act of discrimination which a person may see fit to make . . . [in] matters of . . . business." Civil Rights Cases, 109 U.S. at 24–25, 3 S.Ct. at 31. Yet more than eighty years later Congress, in its Civil Rights Acts, and the Supreme Court, in *Jones v. Alfred Mayer,* concluded that such acts of private discrimination could and should be reached.

It is now but 23 years since *Brown v. Board of Education* overruled *Plessy v. Ferguson.* It is too early, far too early, to argue that the legislature may not use race-sensitive classifications to remedy past discrimination. For this Court to hold otherwise would be to shut our eyes, like Justice Bradley, to the pervasive racial inequality remaining to be undone.

The plaintiffs' motions for preliminary and permanent injunctive relief are denied and judgment is entered for the defendants. Defendants shall prepare an order accordingly.

---

tutional right, intends no punishment and any burden imposed is feasible, cf. *Clark v. Universal Builders, Inc.,* 501 F.2d at 331. Such feasibility is assured by the possibility of waiver. Even if we would review any as-applied claim in light of these conclusions, the plaintiffs have neither claimed nor produced any evidence to prove that the construction industry in the relevant trade area did not engage in discriminatory practices against minorities. If they were to make such a showing, plaintiffs might then argue that the 10 percent requirement hits so far wide of the mark, namely remedying past discrimination, that the requirement is not reasonably related to the remedial purpose. Plaintiffs have offered no such proof nor made such an argument. We need not therefore reach this question.

2) With regard to the as-applied attack that the 10 percent requirement is not feasible given Rhode Island's minority population, it is apparent that plaintiffs have not yet exhausted their other administrative and judicial remedies. Cf. n.3, *supra.* Plaintiffs' first remedy would clearly lie in the statute's waiver provision with respect to Pawtucket and other projects.

Plaintiffs have not alleged that either non-responsive bidder requested that the City of Pawtucket seek a waiver. Failure to seek or grant a waiver would open the way for judicial review of the administrative actions of both city and federal officials.

However, the issues would not be of constitutional dimension, but would involve questions of administrative discretion or involve the construction of the statute or its implementing regulations. Nothing in the statute or the regulations suggests that an unreasonable minority business requirement, beyond the capacity of local contractors, was meant to be imposed. Rather local conditions including minority population and the availability of minority business enterprises are supposed to shape the extent of the requirement. Indeed, if the minority population is so small that no minority enterprises are available, the grantee can seek a waiver even before requesting bids. Guidelines (Aug., 1977) at 15. Thus an as-applied attack on the 10 percent requirement would actually be an attack on rules promulgated or administrative action taken pursuant to a constitutional provision.